**[ORAL ARGUMENT HAS NOT BEEN SET]**

No. 12-5378

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

COLUMBIA SAINT MARY'S HOSPITAL MILWAUKEE, INC.,

*Plaintiff-Appellee*,

v.

SYLVIA MATHEWS BURWELL, Secretary, United States Department of Health and Human Services,

*Defendant-Appellant.*

---

On Appeal From The United States District Court For The District of Columbia
(Hon. Amy Berman Jackson, J.), No. 09-2031

---

### BRIEF FOR APPELLEE COLUMBIA SAINT MARY'S HOSPITAL MILWAUKEE, INC.

Salvatore G. Rotella, Jr.
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: 215.851.8100
Fax: 215.851.1420
srotella@reedsmith.com

David J. Bird
Richard L. Heppner Jr.
M. Patrick Yingling
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: 412.288.3131
Fax: 412.288.3063
dbird@reedsmith.com
rheppner@reedsmith.com
mpyingling@reedsmith.com

*Counsel for Appellee Columbia Saint Mary's Hospital Milwaukee, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Plaintiff-Appellee certifies as follows:

**(A)    Parties and Amici**

All parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief for the Appellant.

**(B)    Rulings Under Review**

The ruling under review in this appeal is the September 28, 2012 Order and accompanying memorandum opinion of the district court (Jackson, J.), which is reported at 893 F. Supp. 2d 172 (D.D.C. 2012).

**(C)    Related Cases**

This case has not previously been before this Court.  This appeal was held in abeyance pending this Court's decision in *Catholic Health Initiatives v. Sebelius*, 718 F.3d 914 (D.C. Cir. 2013).  Appellee is aware of no related cases other than the cases listed in the Appellant's Certificate as to Parties, Rulings, and Related Cases.

Respectfully submitted,

/s/ *David J. Bird*
David J. Bird
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: 412.288.3131
dbird@reedsmith.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... vi

INTRODUCTION .............................................................................. 1

STATEMENT OF THE ISSUES......................................................... 5

PERTINENT STATUTES AND REGULATIONS ............................. 5

STATEMENT OF THE CASE ........................................................... 5

      A.    Statutory And Regulatory Framework ................................. 5

      B.    The Secretary's Past And Current Interpretations Of The Phrase "Entitled To Benefits Under Part A" As It Appears In The Medicaid DSH Fraction, Elsewhere In The DSH Formula, And Elsewhere In The Medicare Statute. ................................. 9

      C.    The Present Litigation ........................................................ 14

SUMMARY OF ARGUMENT ........................................................ 20

ARGUMENT ................................................................................... 24

I.    Standard And Scope Of Review.................................................. 24

II.   The Interpretation Announced In *Edgewater* Of The Medicaid DSH Fraction Cannot Be Retroactively Applied To Columbia Saint Mary's 1999 Cost-Reporting Period. .................................. 24

      A.    The Interpretation Of The Medicaid DSH Fraction Announced In *Edgewater* Represents An Abrupt Departure From A Well Established Prior Policy. ..................................................... 25

      B.    The Secretary Has Waived Any Argument That Columbia Saint Mary's Failed To Show Detrimental Reliance On The Secretary's Preexisting Policy............................................. 34

i

C.    At A Minimum, This Court Should Remand With Instructions To Remand To The Agency So That Columbia Saint Mary's May Have An Opportunity To Show Its Detrimental Reliance On The Secretary's Preexisting Policy. ...............................................37

D.    The Secretary's Argument That This Case Is Identical To *Catholic Health* Is Unavailing...............................................................40

    1.    The Entirety Of The Secretary's Argument Is That This Case Is Identical To *Catholic Health*........................................40

    2.    The Secretary Has Chosen To Make A Detrimental Reliance Argument That She Forfeited In The District Court, Despite Notice Of Her Waiver. ....................................41

    3.    The Secretary's Opening Brief Does Not Come To Grips With Her Waiver Of The Detrimental Reliance Issue And Does Not Even Argue That The District Court Was Wrong When It Found That *Edgewater* Changed An Established Prior Policy. ...........................................................................44

CONCLUSION ........................................................................................45

# TABLE OF AUTHORITIES[1]

**Page**

## Cases

*Aliceville Hydro Assocs. v. FERC*,
  800 F.2d 1147 (D.C. Cir. 1986) .................................................. 19, 24

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ................................................... 33, 45

*Bain v. MJJ Prods., Inc.*,
  751 F.3d 642 (D.C. Cir. 2014) ..........................................................34

*Bennett v. Islamic Republic of Iran*,
  618 F.3d 19 (D.C. Cir. 2010) ...........................................................34

*Buccaneer Point Estates, Inc. v. United States*,
  729 F.2d 1297 (11th Cir. 1984)........................................................39

*Cabell Huntingdon Hosp. v. Shalala*,
  101 F.3d 984 (4th Cir. 1996).....................................................32, 33

* *Catholic Health Initiatives-Iowa v. Sebelius*,
  718 F.3d 914 (D.C. Cir. 2013) ................................ 3, 4, 16, 18, 25, 26, 33, 38, 42

*Catholic Health Initiatives-Iowa v. Sebelius*,
  841 F. Supp. 2d 270 (D.D.C. 2012),
  *rev'd* 718 F.3d 914 (D.C. Cir. 2013) ...................................... 16, 27, 36

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .......................................................................23

*Democratic Senatorial Campaign Comm. v. FEC*,
  139 F.3d 951 (D.C. Cir. 1998) .........................................................38

*District of Columbia v. Air Florida, Inc.*,
  750 F.2d 1077 (D.C. Cir. 1984) .......................................................34

* *Edgewater Medical Center v. Blue Cross & Blue Shield Ass'n*,
  HCFA Adm'r Dec., 2000 WL 1146601 (June 19, 2000)............... 2, 5, 12, 13, 32

*Edgewater Medical Center v. Blue Cross & Blue Shield Ass'n*,
  PRRB Dec. No. 94-0616, 2000 WL 394354 (Apr. 7, 2000)........................ 13, 31

---

[1] Authorities upon which the Appellee chiefly relies are marked with asterisks. *See* D.C. Cir. Rule 28(a)(2).

* *Jersey Shore Medical Center v. Blue Cross and Blue Shield Association/Blue Cross of New Jersey*, HCFA Adm'r Dec., *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 80,153 (Jan. 4, 1999) ............................................................... 12, 13, 30, 31

*Jewish Hospital v. Secretary of HHS*, 19 F.3d 270 (6th Cir. 1994) ........................................................ 14, 15

*Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658 (D.C. Cir. 1994) .............................................................34

*Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044 (5th Cir. 1998) .........................................................39

* *Presbyterian Med. Ctr. of Phila. v. Aetna Life Ins. Co.*, HCFA Adm'r Dec., 1996 WL 887683 (Nov. 29, 1996) ......................... 12, 29, 30

*Pub. Serv. Co. of Col. v. FERC*, 91 F.3d 1478 (D.C. Cir. 1996) ...........................................................39

* *Retail, Wholesale & Dep't Store Union, AFL-CIO v. N.L.R.B.*, 466 F.2d 380 (D.C. Cir. 1972) ..........................................................25

*Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C. Cir. 1992) .................................................. 34, 37

*Smith v. Lanier*, 726 F.3d 166 (D.C. Cir. 2013) ...........................................................23

*Tarpley v. Greene*, 684 F.2d 1 (D.C. Cir. 1982). .........................................................43

*Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999) .........................................................38

*Washington Water Power Co. v. FERC*, 201 F.3d 497 (D.C. Cir. 2000) ...........................................................39

*Williams Natural Gas Co. v. FERC*, 3 F.3d 1544 (D.C. Cir. 1993) .................................................. 19, 24

**Statutes**

42 U.S.C. §§ 1395c – 1395i-5............................................................5

42 U.S.C. § 1395d............................................................... 5, 6, 9

42 U.S.C. § 1395oo............................................................8

42 U.S.C. § 1395ww(d) ...........................................................1, 6

42 U.S.C. § 1395ww(d)(5)(F) ............................................................... 1, 27

42 U.S.C. § 1395ww(d)(5)(F)(i)(I) .........................................................1, 6

42 U.S.C. § 1395ww(d)(5)(F)(v) ............................................................6

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) & (II) ............................................ 6, 7, 9, 18

42 U.S.C. § 1395ww(d)(5)(G) ............................................................ 10, 27

## Regulations

42 C.F.R. § 409.3 ...............................................................................11

42 C.F.R. § 409.61(a) .........................................................................7

42 C.F.R. § 421 ...................................................................................9

51 Fed. Reg. 16772 ............................................................ 11, 27, 29, 34

51 Fed. Reg. 31454 ............................................................... 11, 27, 28

55 Fed. Reg. 35990 .................................................................... 12, 28

60 Fed. Reg. 29202 .................................................................... 12, 29

60 Fed. Reg. 45778 .............................................................. 12, 28, 29

61 Fed. Reg. 27444 .................................................................... 12, 29

61 Fed. Reg. 46166 .................................................................... 13, 30

69 Fed. Reg. 48915 .................................................................... 14, 33

# GLOSSARY

| | |
|---|---|
| "Department" | Department of Health and Human Services |
| "DPP" | Disproportionate patient percentage |
| "DSH" | Disproportionate share hospital |
| "FY" | Fiscal year |
| "Secretary" | Secretary of Health and Human Services |
| "SSI" | Supplemental security income |

## INTRODUCTION

Under Medicare Part E, the government reimburses hospitals for certain inpatient hospital services. 42 U.S.C. § 1395ww(d). The reimbursement is subject to adjustments, including the "disproportionate share hospital" (DSH) adjustment at issue here. Under the DSH adjustment, the government pays more to hospitals that "serve[ ] a significantly disproportionate number of low-income patients." *Id.* § 1395ww(d)(5)(F)(i)(I). The DSH adjustment is based on the hospital's "disproportionate patient percentage" (DPP)—an estimate of how many of a hospital's total days providing inpatient hospital services (patient days) were attributable to treating low-income patients—a percentage calculated by adding two statutorily defined fractions. *Id.* § 1395ww(d)(5)(F). Whether patient days are counted in the first fraction or the second depends on whether or not the patients "(for such days) were entitled to benefits under part A of [Medicare]." *Id.*

This case concerns whether the Secretary of Health and Human Services (Secretary) can apply her current interpretation of the phrase "entitled to benefits under part A of [Medicare]" retroactively to the 1999 cost reports of Columbia Saint Mary's Hospital (Columbia Saint Mary's) to reduce the hospital's DPP and thus its DSH adjustment. The district court correctly ruled that she could not. That judgment should be affirmed because the argument that the Secretary presents on appeal—an argument that Columbia Saint Mary's must show detrimental reliance

1

on a prior policy of the Department of Health and Human Services (Department)—was never raised in the district court, and is therefore waived.

This case comes shortly after *Catholic Health Initiatives v. Sebelius*, 718 F.3d 914 (D.C. Cir. 2013) (*Catholic Health*). Like this case, *Catholic Health* also concerned whether the Secretary's current interpretation of the phrase "entitled to benefits under part A of [Medicare]" could be applied retroactively to reduce a hospital's DPP and DSH adjustment. In *Catholic Health*, the Secretary and the plaintiff hospital both assumed that the current interpretation was first established in a rulemaking issued in 2004, and the parties framed their retroactivity arguments around whether the 2004 rule could be retroactively applied to the plaintiff hospital's cost reports from prior years. However, in *Catholic Health*, this Court ruled that the Secretary and plaintiff hospital had mis-framed the issue. The Court held that the Secretary's current interpretation of the phrase "entitled to benefits under part A" was established in a 2000 adjudication, *Edgewater Medical Center v. Blue Cross & Blue Shield Ass'n*, HCFA Adm'r Dec., 2000 WL 1146601 (June 19, 2000) (*Edgewater*).

The shift in focus from the retroactive application of the 2004 rule to the retroactive application of the 2000 *Edgewater* adjudication had important implications for the arguments of both the Secretary and the plaintiff hospital in *Catholic Health*. An adjudication generally may be applied retroactively unless

- 2 -

the challenger shows (1) that the adjudication announced a new rule that was an abrupt departure from well established prior agency policy or practice, and (2) that the challenger had relied to its detriment on the prior agency policy or practice.  In *Catholic Health*, the Court found that the plaintiff hospital had fumbled by (1) failing to show detrimental reliance on a prior agency policy or practice, and (2) failing to argue that the Secretary had waived the issue by not raising it in the district court, when the hospital was asked about this detrimental reliance issue on appeal.  718 F.3d at 922 & n.6.  With respect to the plaintiff hospital's failure to assert appellate waiver, the Court noted that "[h]ad Catholic Health argued that the Secretary waived the right to argue a lack of reliance, then the agency might well have been foreclosed from prevailing on this point so late in these proceedings." *Id.* at 922 n.6.

Because the plaintiff hospital in *Catholic Health* failed to show detrimental reliance or assert the Secretary's apparent waiver of that issue, the reversed the district court's judgment in favor of the plaintiff hospital.  *Id.* at 922.  The Court's decision in *Catholic Health* left open for a future case:  (1) whether the interpretation of the phrase "entitled to benefits under part A of [Medicare]" announced in *Edgewater* was an abrupt departure from an established prior rule or policy, and (2) whether the Secretary would be barred from raising the issue of

detrimental reliance after failing to make any argument about detrimental reliance in the district court.

This case picks up where *Catholic Health* left off. In this case, as in *Catholic Health*, the district court held that the Secretary's current interpretation cannot be applied retroactively to Columbia Saint Mary's 1999 cost reports, which obviously pre-date the 2000 *Edgewater* adjudication. The Secretary argues on appeal that the district court's judgment must be reversed because Columbia Saint Mary's failed to show detrimental reliance on a policy established prior to the 2000 *Edgewater* adjudication, and she urges the Court not to reach the issue of whether *Edgewater* was an abrupt departure from an established prior policy or practice.

But, as foreshadowed in this Court's *Catholic Health* opinion, the Secretary has waived the right to attack the district court judgment on this ground because she never raised that lack-of-reliance argument in the district court. Thus, the Court should reach the question of whether *Edgewater* was an abrupt departure from the Department's prior established policy, hold it was, and affirm the district court's judgment. At a minimum, if this Court relieves the Secretary of the consequences of her waiver and permits her to raise the detrimental reliance issue now, then the case should be remanded so that Columbia Saint Mary's has an opportunity to show detrimental reliance on the Department's prior policy.

- 4 -

## STATEMENT OF THE ISSUES

1. Whether the Secretary's interpretation of "entitled to benefits under Part A of [Medicare]" in *Edgewater Medical Center v. Blue Cross & Blue Shield Association*, HCFA Adm'r Dec., 2000 WL 1146601 (June 19, 2000), was a departure from a clear prior policy.

2. Whether the Secretary is barred from arguing for the first time on appeal that Columbia Saint Mary's did not detrimentally rely on the Secretary's pre-*Edgewater* policy because she failed to raise the detrimental reliance issue in the district court.

## PERTINENT STATUTES AND REGULATIONS

Relevant statutory and regulatory provisions are attached in the addendum.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Framework

The federal Medicare program provides health insurance for disabled and elderly individuals and reimburses qualifying hospitals for services provided to eligible patients.  The Medicare statute contains five parts, two of which are relevant here.  Part A establishes the requirements for individuals to receive Medicare benefits.  *See* 42 U.S.C. §§ 1395c – 1395i-5.  These benefits include coverage for "inpatient hospital services."  *Id.* § 1395d.  Part A coverage for inpatient hospital services is limited to a certain number of days, after which coverage is exhausted.  Specifically, under Medicare Part A, beneficiaries are

entitled to coverage for the first 90 days of their stay, after which they may elect to use up to 60 "lifetime reserve days." 42 C.F.R. § 409.61(a); *see also* 42 U.S.C. § 1395d.

Part E sets out "Miscellaneous Provisions," including a progressive payout system for reimbursing hospitals that provide inpatient hospital services covered under Part A. 42 U.S.C. § 1395ww(d). Based on hospital-specific factors, payments to hospitals are subject to adjustments, including the adjustment at issue in this case, the "disproportionate share hospital" (DSH) adjustment. Under the DSH adjustment, the government pays more to hospitals that "serve[ ] a significantly disproportionate number of low-income patients." *Id.* § 1395ww(d)(5)(F)(i)(I).

A hospital's DSH adjustment is based on its "disproportionate patient percentage" (DPP). *Id.* § 1395ww(d)(5)(F)(v). The DPP is statutorily defined as the sum of two fractions, the "Medicare/SSI fraction" and the "Medicaid fraction." The Medicare/SSI fraction is:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of [Medicare] and were entitled to supplementary security income [SSI] benefits . . . , and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of [Medicare] . . . .

*Id.* § 1395ww(d)(5)(F)(vi)(I). The Medicaid fraction is:

- 6 -

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid plan], but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such period.

*Id.* § 1395ww(d)(5)(F)(vi)(II).

The Medicare/SSI and Medicaid fractions measure two distinct and separate populations of low income patients.  When summed, the two fractions provide a proxy for the percentage of patient days spent serving low-income patients.  The Medicare/SSI fraction accounts for patient days covered by Medicare that were spent serving low-income patients by asking:  out of all patient days attributable to Medicare beneficiaries, what percentage of those days came from patients who received SSI benefits?  The Medicaid fraction accounts for patient days *not* covered by Medicare that were spent serving low-income patients by asking:  out of all patient days in total, what percentage came from patients who were *not* entitled to receive benefits under Medicare, but were eligible for benefits under Medicaid?  A representation of the two fractions is given below:

| **Medicare/SSI Fraction** | **+** | **Medicaid Fraction** | **=** | **DPP** |
|---|---|---|---|---|

$$\frac{\text{Patient days for patients ``entitled to benefits under part A'' } and \text{ ``entitled to SSI benefits''}}{\text{Patient days for patients ``entitled to benefits under part A''}} + \frac{\text{Patient days for patients ``eligible for [Medicaid]'' but ``\textbf{\textit{not}} entitled to benefits under part A''}}{\text{Total number of patient days}} = \text{Disproportionate Patient Percentage}$$

A hospital's DPP, and thus its DSH adjustment, are calculated in the first instance by a fiscal intermediary, which is typically a private insurance company acting as the agent of the Secretary. *See* 42 C.F.R. § 421.1, 421.3, 421.100-.128. A hospital may appeal an intermediary's decision to the Provider Reimbursement Review Board ("Board" or "PRRB"), an administrative body appointed by the Secretary, which may affirm, modify, or reverse the intermediary's decision. 42 U.S.C. § 1395oo(a), (d) & (h). The Secretary in turn may affirm, modify, or reverse the Board's decision. *Id.* § 1395oo(f). Final decisions of the Board, or any affirmance, modification, or reversal by the Secretary, may be challenged in the United States district courts. *Id.*

> **B.** **The Secretary's Past And Current Interpretations Of The Phrase "Entitled To Benefits Under Part A" As It Appears In The Medicaid DSH Fraction, Elsewhere In The DSH Formula, And Elsewhere In The Medicare Statute.**

This case involves the Secretary's changing interpretations of the phrase

"entitled to benefits under part A" as it appears in the Medicaid fraction numerator:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State [Medicaid plan], but who were not ***entitled to benefits under part A of [Medicare]***, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). Or, expressed graphically

as a fraction:

**Medicaid Fraction**

$$\frac{\text{Patient days for patients "eligible for [Medicaid]" but "\textit{\textbf{not entitled to benefits under part A}}"}}{\text{Total number of patient days}}$$

In particular this case concerns whether patient days that are attributable to patients

who (1) are eligible for Medicaid, (2) meet the statutory criteria for Medicare

eligibility, but (3) have exhausted their Medicare coverage under § 1395d are days

that are attributable to patients "eligible for [Medicaid]" but "***not entitled to***

***benefits under part A.***"  The answer affects the handling of patient days for

patients eligible for both Medicaid and Medicare ("dual-eligible patients"), but who have exhausted their Medicare benefits ("dual-eligible exhausted days").  If such patients are deemed "entitled to benefits under part A" (even though their Part A coverage is exhausted for the days at issue), then patient days attributable to them would not be included in the numerator of the Medicaid fraction, which in many cases would result in lower DPP and thus lower payments to hospitals.

In a 1986 interim final rule, the Secretary first interpreted the phrase "entitled to benefits under part A of [Medicare]."  51 Fed. Reg. 16772, 16777 (May 6, 1986).  The Secretary did so while interpreting the phrase as it appears in the statutory definition of the Medicare/SSI fraction.   The Secretary stated that the phrase "entitled to benefits under part A of [Medicare]" included only "***covered*** [or ***paid***] Medicare Part A inpatient days . . . ."  *Id.* (emphasis added).[2]  After allowing for comments, the Secretary maintained the same interpretation in the final rule. 51 Fed. Reg. 31454, 31460-61 (Sept. 3, 1986).

In a 1990 final rule, the Secretary articulated the same interpretation of the phrase "entitled to benefits under part A of [Medicare]" when interpreting the prospective payment provision in § 1395ww(d)(5)(G), a provision that is adjacent

---

[2]  The term "[c]overed," as used in the Medicare program, generally "refers to services for which the law and the regulations authorize Medicare payment." 42 C.F.R. § 409.3.  Therefore, services furnished after a beneficiary exhausts his or her Medicare Part A benefits are neither "covered" nor "paid" by Medicare Part A.

to the provision governing DSH adjustments and that governs prospective Medicare payments to reimburse hospitals' capital-related costs.  55 Fed. Reg. 35990, 35996 (Sept. 4, 1990).

In 1995, in keeping with the Secretary's prior interpretations, the Secretary considered the meaning of the particular statutory language at issue here (the language of the Medicaid fraction) and announced that days that were not covered (or paid) by Medicare Part A were "not entitled to benefits under part A of [Medicare]" and thus should not be included in the numerator of the Medicaid fraction.  The Secretary stated:

> A hospital's disproportionate share adjustment is determined by calculating two patient percentages (Medicare Part A/Supplemental Security Income (SSI) covered days to total Medicare covered days, and ***Medicaid but not Medicare Part A covered days*** to total inpatient hospital days), adding them together, and comparing that total percentage to the hospital's qualifying criteria.

60 Fed. Reg. 45778, 45811 (Sept. 1, 1995) (emphasis added).  The emphasized language describes the Medicaid fraction numerator as including inpatient days "covered," or paid for, by Medicaid, but not covered, or paid for, by Medicare.  In other words, the Department logically interpreted the phrase "not entitled to benefits under part A of [Medicare]" in the Medicaid fraction as meaning days not paid for by Medicare.  This language appeared verbatim in three additional Federal Register notices in 1995 and 1996.  *See* 60 Fed. Reg. 29202, 29244 (June 2, 1995)

- 11 -

(proposed rule); 61 Fed. Reg. 27444, 27473 (May 31, 1996) (proposed rule); 61 Fed. Reg. 46166, 46206 (Aug. 30, 1996) (final rule).

In a 1996 adjudication, the Secretary applied this interpretation of "not entitled to benefits under part A of [Medicare]" in the Medicaid fraction to the precise issue presented in this case—whether dual eligible exhausted days are days that are attributable to patients "eligible for [Medicaid]" but "***not entitled to benefits under part A***."

The Secretary held that dual eligible exhausted days are days attributable to patients "eligible for [Medicaid]" but "***not entitled to benefits under part A***" and that dual eligible exhausted days are days should be included in the numerator of the Medicaid fraction. *See Presbyterian Med. Ctr. of Phila. v. Aetna Life Ins. Co.*, HCFA Adm'r Dec., 1996 WL 887683, at *4-5 (Nov. 29, 1996). The Secretary maintained this policy and practice through 1999, as indicated in *Jersey Shore Medical Center v. Blue Cross and Blue Shield Association/Blue Cross of New Jersey*, HCFA Adm'r Dec., *reprinted in* Medicare & Medicaid Guide (CCH) ¶ 80,153 (Jan. 4, 1999).

In 2000, however, the Secretary abruptly changed course by announcing a new policy and interpretation of the phrase "not entitled to benefits under part A of [Medicare]" in the Medicaid fraction in *Edgewater Medical Center v. Blue Cross & Blue Shield Association*, HCFA Adm'r Dec., 2000 WL 1146601 (June 19,

2000). At first, when the question was before the Board, the Board followed the established Department policy, stating that it "continues to maintain that the DSH numerator should include days of dually eligible patients whose Medicare Part A benefits were exhausted and who were eligible for reimbursement under the State's Medicaid plan." *Edgewater Med. Ctr. v. Blue Cross & Blue Shield Ass'n*, PRRB Dec. No. 940616, 2000 WL 394354, at *4 (Apr. 7, 2000) (citing *Jersey Shore*, HCFA Adm'r Dec. (Jan. 4. 1999)). But on review the Secretary abruptly departed from that established policy and took a contrary position, stating, for the first time, that dual-eligible exhausted days were days for which a patient was "entitled to benefits under Part A of [Medicare]" and that such days should *not* be included in the Medicaid fraction. *See Edgewater*, HCFA Adm'r Dec., 2000 WL 1146601, at *4.

Following *Edgewater*, the Secretary sought to revise the existing rules to exclude dual-eligible exhausted patient days from the numerator of the Medicaid fraction, based upon its new interpretation of the phrase "entitled to benefits under part A of [Medicare]." This culminated in a 2004 rulemaking in which the Secretary stated that dual-eligible exhausted days would not be included in the Medicaid fraction. *See* 69 Fed. Reg. 48915, 49099 (Aug. 11, 2004).

### C.    The Present Litigation

Columbia St. Mary's is an acute care hospital in Milwaukee, Wisconsin that participates in the federal Medicare program.   AR 19, JA_.[3]   For the period covered by the hospital's fiscal year ending June 1999, Columbia Saint Mary's had a patient eligible for both Medicare and Medicaid—a dual-eligible patient—who spent 365 days in the hospital that Medicare did not pay for because the patient's Medicare hospital coverage had been exhausted.  *Id.*  The fiscal intermediary that calculated Columbia Saint Mary's DSH adjustment did not include the patient's 365 unpaid hospital days in the Medicaid numerator because it interpreted the phrase "entitled to benefits under Part A of [Medicare]" in the numerator to mean simply whether the patient was enrolled in Medicare, not whether the patient's hospital days were actually covered (*i.e.*, paid for) by the program.  AR 20, JA_.

Columbia Saint Mary's appealed the fiscal intermediary's calculation to the Board, which decided in favor of Columbia Saint Mary's, holding that "entitled" to a benefit means "the absolute right to receive an independent and readily defined payment."  AR 21, JA_.  The Board relied on *Jewish Hospital v. Secretary of HHS*, 19 F.3d 270, 275 (6th Cir. 1994)—a Sixth Circuit decision interpreting the

---

[3] Citations to the Administrative Record include page numbers and are in the form: "AR __."  Citations to the filings in the district court include docket entry numbers and page numbers and are in the form: "Dkt. __ at __."  When a document is designated for the Joint Appendix, an additional citation is included in the form: "JA_."

Medicaid fraction numerator and holding that "[t]o be *entitled* to some benefit means that one possesses the *right* or *title* to that benefit"—and the Board noted that the "issue is not new and the Board has consistently applied the holdings of the Court in *Jewish Hospital* to its resolution." AR 21, JA_. However, the Secretary, through the Centers for Medicare & Medicaid Services, overturned the Board's decision, stating that "it is the status of the patients, as opposed to the payment for the day, which determines whether a patient day is included in the numerator of the Medicaid proxy." AR 6, JA_.[4]

Columbia Saint Mary's challenged the Secretary's decision in the U.S. District Court for the District of Columbia (Jackson, J.). After Columbia Saint Mary's and the Secretary filed cross motions for summary judgment on the meaning of the phrase "not entitled to benefits under Part A of [Medicare]" and whether dual-eligible exhausted days should be included in the Medicaid fraction numerator, the U.S. District Court for the District of Columbia (Lamberth, J.) decided *Catholic Health Initiatives-Iowa v. Sebelius*, 841 F. Supp. 2d 270 (D.D.C. 2012), *rev'd* 718 F.3d 914 (D.C. Cir. 2013). In that case, a different plaintiff hospital (Catholic Health) also challenged the Secretary's exclusion of dual-

---

[4] Because of the Secretary's ruling, the patient days at issue were not counted in the Medicaid fraction numerator (as days for which the patient was "***not*** entitled to benefits under part A of [Medicare]"), and they also were not counted in the Medicare/SSI fraction (as days for which the patient was "entitled to benefits under part A of [Medicare]").

eligible exhausted days from the numerator of the Medicaid fraction. Catholic Health specifically argued that the Secretary's interpretation of the Medicaid fraction as excluding dual-eligible exhausted days could not be applied to its FY 1997 DSH adjustment. Judge Lamberth held that the Secretary's *Edgewater* decision and the 2004 rulemaking effected a substantive change from the Secretary's previous policy of including dual-eligible exhausted days in the numerator of the Medicaid fraction, and that applying the Secretary's new policy to the FY 1997 DSH adjustment was impermissibly retroactive. *Id.* at 282.

Shortly after Judge Lamberth's decision, Judge Jackson ordered Columbia Saint Mary's and the Secretary to file supplemental briefs in this case addressing the effect of the *Catholic Health* decision on this case. Columbia Saint Mary's argued that the Secretary's new policy of excluding dual-eligible exhausted days from the Medicaid fraction numerator could not be applied retroactively to Columbia Saint Mary's FY 1999 DSH adjustment, and that Judge Lamberth's decision recognizing that principle should be followed. Dkt. 32 at 4-14, JA_. The Secretary argued that the Secretary "*never* had a policy and practice of *including* exhausted inpatient hospital coverage days in the Medicaid fraction" prior to *Edgewater* and that Judge Lamberth, therefore, erred in ruling that she did. Dkt. 30 at 7, JA_. Notably, the Secretary did not argue to Judge Jackson that Columbia Saint Mary's had failed to show detrimental reliance on the Secretary's prior

interpretation or that Columbia Saint Mary's was otherwise foreclosed from attacking the retroactive application of the Secretary's new interpretation. The Secretary simply argued that Judge Lamberth erred in *Catholic Health* in finding that the Secretary had a clear policy or practice in place prior to *Edgewater*. *See* Dkts. 30 and 33, JA__.

Judge Jackson granted summary judgment to Columbia Saint Mary's, holding that "even if [the court] assumes the Secretary's interpretation is permissible, applying that interpretation to Columbia St. Mary's 1999 DSH adjustment would be an improper retroactive application of the agency's current rule." *Columbia St. Mary's Hosp. v. Sebelius*, 893 F. Supp. 2d 172, 174 (D.D.C. 2012), Dkt. 35, JA__. The district court specifically held that "before April 2000, the Secretary had a policy and practice of including unpaid Medicare benefit days in the Medicaid numerator of the DSH calculation" and that "[i]t was not until 2000, with *Edgewater*, that the agency implemented a substantive change from that prior policy and practice, and began excluding unpaid Medicare days from the numerator." *Id.* at 184, JA__.

The Secretary appealed the district court's judgment to this Court. The Secretary's appeal was held in abeyance pending the Court's resolution of the Secretary's appeal in *Catholic Health*.

On June 11, 2013, a panel of this Court issued a decision in *Catholic Health*, reversing the Judge Lamberth's decision in favor of the plaintiff hospital.  *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914 (D.C. Cir. 2013).   The panel held that the phrase "entitled to benefits under Part A of [Medicare]," as used to define the Medicaid fraction numerator, was ambiguous and that deference was owed to the Secretary's current interpretation of the statutory language.  *Id.* at 920. Thus, the panel held that the Secretary's 2004 revision of the Medicare regulations was "substantively valid."  *Id.* at 921.

The panel then turned to the question of whether the 2004 rulemaking could be applied retroactively to the plaintiff hospital's 1997 DSH adjustment.  *Id.* at 920-22.  The panel found that both the plaintiff hospital and the Secretary had mis-framed the issued by focusing on whether the 2004 rulemaking could be applied retroactively.  *Id.* at 921.  The panel explained that the Secretary had first adopted its current interpretation of the phrase "entitled to benefits under Part A of [Medicare]" in the Medicaid fraction of § 1395ww(d)(5)(F)(vi)(II) in the 2000 *Edgewater* administrative adjudication, and that the 2004 rulemaking "was simply a reiteration" of the interpretation articulated in *Edgewater*.  *Id.*  Therefore, the question was whether it would be improper to apply the "*Edgewater* interpretation*,*" as opposed to the 2004 rulemaking, "'retroactively' to Catholic Health."  *Id.* at 922.

On this point, the panel acknowledged that it generally is necessary to deny "retroactive effect to a rule announced in an agency adjudication" where the adjudication "substitut[es] . . . new law for old law that was reasonably clear" and "to protect the settled expectations of those who had relied on the preexisting rule." *Id.* (quoting *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993) and *Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1152 (D.C. Cir. 1986)). Nevertheless, the panel held that it did not need to decide whether the *Edgewater* adjudication "constituted a legal *volte face*." *Id.* According to the panel, the plaintiff hospital had failed to explain in its briefing or at oral argument how it relied to its detriment on the alleged prior policy and it also had failed to argue "that the Secretary waived the right to argue a lack of reliance" by not raising that argument in the district court. *Id.* n.6 (finding that the plaintiff hospital had "waived any waiver argument"). The *Catholic Health* panel left open for a future case the question of the Secretary's waiver of the detrimental reliance issue, but it noted that, if the hospital had argued that the Secretary had waived the issue, "the agency might well have been foreclosed from prevailing on this point so late in these proceedings." *Id.*

Following the decision of the *Catholic Health* panel, this case was returned to the Court's active docket and the parties filed motions to govern future proceedings in light of the *Catholic Health* opinion. The Secretary sought

summary reversal based on the same argument that she makes in her opening brief—namely that the reversal is required because Columbia Saint Mary's did not show detrimental reliance.  Document #1463984, Sec. Mtn.  For its part, Columbia Saint Mary's requested full briefing for Columbia Saint Mary's to advance the argument that "(1) the Secretary has waived the right to argue a lack of reliance by failing to raise the issue in the district court, (2) the Court therefore must reach the question of whether the *Edgewater* adjudication constituted a change in a 'reasonably clear' legal interpretation established by the Secretary prior to June 19, 2000, and (3) the *Edgewater* adjudication may not be retroactively applied to DSH adjustments for other hospitals in prior years."  Document #1464078, Pl. Mtn. at 8.  On April 23, 2014, this Court denied the Secretary's request for summary reversal and instructed the Clerk to calendar the case for presentation to a merits panel.

## SUMMARY OF ARGUMENT

The district court's holding in this case—that the interpretation of the phrase "entitled to benefits under part A of [Medicare]" in the Medicaid fraction numerator announced in the 2000 *Edgewater* decision cannot be retroactively applied to Columbia Saint Mary's 1999 cost-reporting period—should be affirmed.  The Secretary's new interpretation cannot be applied retroactively to Columbia Saint Mary's because *Edgewater* was an abrupt change from the Secretary's established prior policy.  The Secretary argues that it does not matter whether

*Edgewater* marked a policy change in how the Secretary interpreted the statutory language because Columbia Saint Mary's failed to show that it detrimentally relied on the prior Department policy. But the Secretary is foreclosed from making this detrimental reliance argument for the first time on appeal because she did not make it in the district court.

*Edgewater*'s interpretation of the relevant statutory language was an abrupt departure from the Secretary's clearly established prior interpretation and policy, as the district court below and the district court in *Catholic Health* both recognized. From 1986 until 2000, the Secretary established and applied an interpretation of the phrase "entitled to benefits under part A of [Medicare]" as referring only to patient days ***covered*** or ***paid for*** by Medicare. Furthermore, the Secretary's policy and practice, expressed in rulemakings and adjudications, repeatedly indicated that this construction of the phrase "entitled to benefits under Part A of [Medicare]" meant that dual-eligible exhausted days must be included in the numerator of the Medicaid fraction. The *Edgewater* decision abruptly changed that interpretation and that policy. That newly announced policy cannot be applied retroactively to Columbia Saint Mary's in this case.

As a panel of this Court explained in *Catholic Health*, a new agency policy announced in an adjudication may have retroactive effect even if it marks an abrupt departure from an established agency policy or practice *if* the regulated entity did

- 21 -

not detrimentally rely on the prior policy or practice. Seizing upon that idea, the Secretary argues that the district court decision in favor of Columbia Saint Mary's cannot stand because Columbia Saint Mary's failed to show detrimental reliance on the Secretary's prior policy. But the Secretary has waived her right to argue lack of reliance because she failed to raise that argument in the district court. The issue of the retroactive application of the *Edgewater* decision was squarely before the district court, and the Secretary never argued that Columbia Saint Mary's had failed to show detrimental reliance. Basic rules of appellate procedure preclude the Secretary from raising that argument for the first time on appeal, as the *Catholic Health* decision noted. Because the Secretary waived any argument concerning detrimental reliance by failing to argue it in the district court, this court must reach the question that it did not reach in *Catholic Health*, namely whether the interpretation announced in the 2000 *Edgewater* adjudication was an abrupt departure from an established prior rule or policy. Because the *Edgewater* decision was just such an abrupt change from a clear prior policy and practice, this Court should affirm the district court's judgment.

At the very least, if this Court is reluctant to enforce the Secretary's waiver, then the case should be remanded to allow Columbia Saint Mary's to establish that it did rely on the Secretary's prior policy. When an issue arises for the first time on appeal, a remand to the district court is appropriate, especially when the factual

- 22 -

record has not been developed on the new issue. Columbia Saint Mary's should be afforded the opportunity to show, for example, that it made business or financing decisions in reliance on the prior policy.

Ultimately, the Secretary's argument is that this case is identical to *Catholic Health*. However, that argument is unavailing. As explained, the Secretary all but ignores the fact that the result in *Catholic Health* was a product of the plaintiff hospital's failure to argue on appeal that the Secretary had waived the right to raise detrimental reliance. Here, Columbia Saint Mary's is making that argument. Moreover, because the Secretary argues this case is just like *Catholic Health*, she (1) urges the Court not to reach the question of whether the *Edgewater* decision marked an abrupt change from an established prior policy, and (2) presents no argument on appeal actually disagreeing with the district court's holding that *Edgewater* was a substantive change from an established policy and practice. Because she does not even contest that holding in her opening brief, the Secretary should not be permitted to do so in her reply brief. The Secretary should be held to the arguments she made—and failed to make—below and on appeal, and the district court should be affirmed.

# ARGUMENT

## I.     Standard And Scope Of Review

This Court reviews a district court's grant of summary judgment *de novo*. *Smith v. Lanier*, 726 F.3d 166, 168 (D.C. Cir. 2013). Deference to the Secretary's view under *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) is not implicated in this case because Columbia Saint Mary's is not challenging the reasonableness of the Secretary's current interpretation of statutory language, but only the lawfulness of applying that interpretation retroactively to prior cost years.

## II.    The Interpretation Announced In *Edgewater* Of The Medicaid DSH Fraction Cannot Be Retroactively Applied To Columbia Saint Mary's 1999 Cost-Reporting Period.

It is necessary to deny "retroactive effect to a rule announced in an agency adjudication" where the adjudication "substitut[es] . . . new law for old law that was reasonably clear" and where doing so protects "the settled expectations of those who had relied on the preexisting rule." *Catholic Health*, 718 F.3d at 922 (quoting *Williams*, 3 F.3d at 1554 and *Aliceville*, 800 F.2d at 1152). Here, it is necessary for this Court to deny retroactive effect to the Secretary's interpretation because, as explained below, the Secretary's interpretation in *Edgewater* represents an abrupt departure from a clear prior policy, and the Secretary has waived her right to argue that Columbia Saint Mary's did not rely to its detriment on that preexisting policy by failing to make that argument in the district court. The

district court's Judgment should not be reversed on a ground that the Secretary never raised. However, if the Court concludes that the Secretary may be relieved of her waiver and may raise the issue of detrimental reliance at this late stage in the proceedings, the Court should remand this matter with instructions to return the case to the agency and provide Columbia Saint Mary's with an opportunity to show detrimental reliance on the Secretary's prior policy.

> **A.     The Interpretation Of The Medicaid DSH Fraction Announced In *Edgewater* Represents An Abrupt Departure From A Well Established Prior Policy.**

As this Court explained in *Catholic Health*, agency adjudications cannot have retroactive effect if they substitute a new law for old law that was reasonably clear. 718 F.3d at 922. In determining whether an agency has made such a substitution, this Court has asked "whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law[.]" *Retail, Wholesale & Dep't Store Union, AFL-CIO v. N.L.R.B.*, 466 F.2d 380, 390 (D.C. Cir. 1972). Where an agency "had confronted the problem before, had established an explicit standard of conduct, and now attempts to [change the consequences of] conformity to that standard under a new standard subsequently adopted[,]" the agency may be prohibited from applying its new rule retroactively. *Id.* at 391 (holding that it was improper for the National

Labor Relations Board to give retroactive effect to a new rule adopted through an agency adjudication).

From the moment the Secretary began interpreting the DSH statute in 1986 until *Edgewater* in 2000, she established (and re-affirmed on numerous occasions) her interpretation of the phrase "entitled to benefits under part A of [Medicare]" as (1) referring only to those patient days that were "covered" (*i.e.*, paid for) by Medicare and thus (2) excluding days spent treating patients who met the statutory criteria for Medicare eligibility, but who had exhausted their Medicare coverage (dual-eligible exhausted days).  Because of the Secretary's longstanding and well documented interpretation of the phrase "entitled to benefits under part A of [Medicare]," the district court in *Catholic Health* and this case correctly concluded that *Edgewater* represented a departure from a clear prior policy.  *Catholic Health*, 841 F. Supp. 2d at 282; *Columbia St. Mary's Hosp.*, 893 F. Supp. 2d at 184-85.

The Secretary's original construction of the phrase "entitled to benefits under part A of [Medicare]" appeared in 1986 when the Department published the first interim final rulemaking implementing the DSH statute.  *See* 51 Fed. Reg. 16772 (May 6, 1986).  In the preamble to the interim final rulemaking, the Secretary construed the phrase "entitled to benefits under part A of [Medicare]" in interpreting the Medicare/SSI fraction, which, the Secretary explained, meant: "if a Medicare beneficiary is eligible for SSI benefits (excluding State

supplementation only) during a month in which the beneficiary is a patient in the hospital, the **covered** Medicare Part A inpatient days of hospitalization in that month will be counted for the purpose of determining the hospital's disproportionate patient percentage." *Id.* at 16777 (emphasis added).  Thus, the Secretary defined "entitled to benefits under part A of [Medicare]" to mean "covered" (*i.e.* paid for) by Medicare.  After allowing for comments, the Secretary issued a final rulemaking in September 1986.  *See* 51 Fed. Reg. 31454 (Sept. 3, 1986).  In that final rulemaking, the Secretary stated that "[i]n the preamble to the interim final rule, we indicated that we would count 'covered' Medicare days in determining the Medicare portion of a hospital's disproportionate patient percentage," and the Secretary elected to maintain this position for purposes of the final rule.  *Id.* at 31460-61.

In 1990, the Secretary again construed the phrase "entitled to benefits under part A of [Medicare]," when issuing a final rulemaking pertaining to a different Medicare provision:  the prospective payment provision in § 1395ww(d)(5)(G).  *See* 55 Fed. Reg. 35990 (Sept. 4, 1990).  That provision is immediately adjacent to the DPP provision in § 1395ww(d)(5)(F) that describes the Medicare/SSI and Medicaid fractions, and both provisions use the same phrase, "entitled to benefits under part A of [Medicare]."   In ruling on what kinds of hospital stays count as "entitled to benefits under part A of [Medicare]" for purposes of the prospective

payment provision, the Secretary stated, "[s]ince patients who have exhausted their part A benefits are no longer entitled to payment under part A, we do not believe such stays should be counted."  55 Fed. Reg. at 35996.  This interpretation of "entitled to benefits under part A of [Medicare]"—as including only days for which Medicare *paid*, not exhausted days—was fully consistent with the Secretary's interpretation of the same phrase in the 1986 rulemaking implementing the DSH statute.  *See* 51 Fed. Reg. at 16777; 51 Fed. Reg. at 31460-61.

In 1995—after interpreting the phrase "entitled to benefits under Part A of [Medicare]" in the Medicare/SSI fraction, and then in the adjacent prospective payment provisions—the Secretary issued a final rulemaking which directly addressed the meaning of the phrase "not entitled to benefits under Part A of [Medicare]" as it appears the Medicaid fraction.  *See* 60 Fed. Reg. 45778.  In proposing changes to the process used by hospitals to seek DSH recalculations, the Secretary described the DSH adjustment as follows:

> A hospital's disproportionate share adjustment is determined by calculating two patient percentages (Medicare Part A/Supplemental Security Income (SSI) covered days to total Medicare covered days, and ***Medicaid but not Medicare Part A covered days*** to total inpatient hospital days), adding them together, and comparing that total percentage to the hospital's qualifying criteria.

*Id.* at 45811 (emphasis added).  This 1995 statement deals directly with the Medicaid fraction language at issue in this case.  The language emphasized above expressly describes the Medicaid numerator as including inpatient days "covered"

(*i.e.*, paid for) by Medicaid, but not covered (*i.e.*, paid for) for by Medicare.  The district court here took note of this 1995 statement and correctly remarked, "[T]he Secretary summarized the phrase 'entitled to benefits under part A [of Medicare]' in the *Medicaid* fraction as meaning days paid for by Medicare."  *Columbia St. Mary's Hosp.*, 893 F. Supp. 2d at 180, JA__.  As the district court also noted, the Secretary published this language from the 1995 final rulemaking verbatim in three more Federal Register notices in 1995 and 1996.  *See* 60 Fed. Reg. 29202, 29244 (June 2, 1995) (proposed rule); 61 Fed. Reg. 27444, 27473 (May 31, 1996) (proposed rule); 61 Fed. Reg. 46166, 46206 (Aug. 30, 1996) (final rule).  These notices, "repeatedly describe the Medicaid numerator as counting unpaid Medicare hospital days."  *Columbia St. Mary's Hosp.*, 893 F. Supp. 2d at 181, JA__.

The Secretary's subsequent adjudications made clear that, under the Secretary's construction of the phrase "not entitled to benefits under Part A of [Medicare]," dual-eligible exhausted days should be included in the numerator of the Medicaid fraction, most notably in *Presbyterian Medical Center of Philadelphia v. Aetna Life Insurance Co.*, HCFA Adm'r Dec., 1996 WL 887683 (Nov. 29, 1996).  In *Presbyterian*, the Secretary—through the HCFA Administrator—addressed two issues:  (1) the meaning of the phrase "eligible" for Medicaid in the first part of the Medicaid fraction and (2) the issue relevant here— how to treat "a number of days that were billed to Medicaid because the patients

had exhausted their Medicare benefits" (*i.e.* dual-eligible exhausted days).  *Id.* at

*2.  On the second issue, the Administrator concluded that dual-eligible exhausted

days were *not* days for which the patients were "entitled to benefits under Part A of

[Medicare]" and held that days for which the patients had exhausted their Medicare

benefits should be included in the numerator of Medicaid fraction.  *Id.*

Thereafter, the Secretary decided *Jersey Shore Medical Center v. Blue Cross*

*and Blue Shield Association/Blue Cross of New Jersey*, Adm'r Dec., *reprinted in*

Medicare & Medicaid Guide (CCH) ¶ 80,153 (Jan. 4, 1999).  In *Jersey Shore* the

Secretary—through an Administrator—reviewed a Board decision that addressed

multiple types of patient days, including dual-eligible exhausted days and "charity

care" patient days relevant under a different Medicare provision.  With respect to

dual-eligible exhausted days, the Board had followed the established construction

of the phrase "not entitled to benefits under Part A of [Medicare]," as it appears in

the Medicaid fraction numerator, and the established policy of including dual-

eligible exhausted days in the numerator of the Medicaid fraction.   As the

Secretary's delegate explained:

> The Board found that, where a State's approved Medicaid program
> assumes responsibility for payment of a provider's inpatient charges,
> the days associated with those charges are, in fact, 'Medicaid days,'
> and that ***all Medicaid days not paid by Medicare must be included in***
> ***the 'Medicaid proxy' of the DSH formula*** consistent with the
> Medicare statute and regulations.

*Id.* (emphasis added). Upon review, the Administrator did not take issue with the Board's decision to include all dual-eligible exhausted days in the numerator of the Medicaid fraction. *Id.* Consistent with the 1995 rulemaking and *Presbyterian*, the Secretary's delegate made it clear that the Board's decision on that issue was correct. But the Administrator vacated the Board's decision because the Board's decision erred in calculating "charity care" patient days, explicitly stating that vacatur was appropriate only in order to "avoid bifurcation of the case." *Id.*

Thus, at the close of the fiscal year at issue in this case (Columbia Saint Mary's 1999 fiscal year), the Secretary had repeatedly construed the phrase "entitled to benefits under part A of [Medicare]" to describe those days attributable to patients whose care was covered (paid for) by Medicare, and had construed the phrase "not entitled to benefits under Part A of [Medicare]" conversely to describe days attributable to patients whose care was not covered (paid for) by Medicare. That interpretation had appeared in interim and final rulemaking, including the 1995 and 1996 final rulemakings specifically interpreting the phrase "not entitled to benefits under part A of [Medicare]" in the Medicaid fraction. And that interpretation had led the Secretary to rule at least twice that dual-eligible exhausted days should be included in the numerator of the Medicaid fraction.

In April 2000, the Board first decided *Edgewater Medical Center v. Blue Cross Blue Shield Association*, PRRB Dec. No. 94-0616, 2000 WL 394354 (Apr.

- 31 -

7, 2000).  In *Edgewater*, the Board followed the established interpretation of the phrase "not entitled to benefits under part A of [Medicare],"  and cited *Jersey Shore* when holding that it "continues to maintain that the DSH numerator should include days of dually eligible patients whose Medicare Part A benefits were exhausted and who were eligible for reimbursement under the State's Medicaid plan." *Id.* at *4.

However, when *Edgewater* was appealed, the Secretary abruptly changed course, reversing the Board and stating that days for dual-eligible patients whose Medicare Part A benefits are exhausted *should not be* included in the Medicaid fraction numerator.  *Edgewater Med. Ctr. v. Blue Cross & Blue Shield Ass'n*, HCFA Adm'r Dec., 2000 WL 1146601, at *4 (June 19, 2000).  As this Court has observed, the Secretary's *Edgewater* decision "did not forthrightly discuss prior statements and administrative decisions that could be thought inconsistent with the interpretation given in that case, and . . . it erroneously claimed that the agency's policy at that time was to include Medicare-exhausted days in the Medicare fraction (in fact, the agency did not follow this practice until the 2004 rulemaking)."  *Catholic Health*, 718 F.3d at 921.  Finally, in a 2004 rulemaking, the Secretary formalized the change of position announced in *Edgewater*, stating

that dual-eligible exhausted days would not be included in the Medicaid fraction. *See* 69 Fed. Reg. 48915, 49099 (Aug. 11, 2004).[5]

Thus, when *Edgewater* announced a new interpretation of "not entitled to benefits under Part A of [Medicare]" in the Medicaid fraction and a new policy of not counting dual-eligible exhausted days in the Medicaid fraction numerator, it represented an abrupt departure from the well established practice and policy in force during Columbia Saint Mary's 1999 fiscal year, the policy that should govern Columbia Saint Mary's FY 1999 DSH adjustment.[6]

---

[5] In short, the Secretary's history with respect to the DSH payment can be reasonably characterized as one of hostility toward the statutory requirement to make such payments and manifests the Secretary's repeated efforts to minimize DSH payments to hospitals. *See Cabell Huntingdon Hosp. v. Shalala*, 101 F.3d 984, 987-90 (4th Cir. 1996). For example, from 1986 through 1997, the Secretary equated the phrase "*eligible* for [Medicaid]" in the numerator of the Medicaid fraction with the phrase "*entitled* to benefits under part A of [Medicare]" so that the Medicaid fraction would only include days ***paid for*** by Medicaid. *See* 51 Fed. Reg. at 16788. Only after four Circuit courts ruled that reading was unreasonable because "eligible" could not be equated with "entitled," did the Secretary acquiesce to a proper interpretation of "eligible." *See* Health Care Fin. Admin. Ruling 97-2 (Feb. 27, 1997); *Cabell Huntingdon*, 101 F.3d at 990-91. It is in this context that the Secretary's abrupt change in policy with respect to the phrase "entitled to benefits under part A of [Medicare]" can be understood—the Secretary was seeking to minimize the effect of its acquiescence on the interpretation of the phrase "eligible for [Medicaid]" in the numerator of the Medicaid fraction by undercounting which days are attributable to patients entitled to benefits under Medicare.

[6] The district court held that the *Edgewater* adjudication represented a "substantive change from [a] prior policy and practice." *Columbia St. Mary's Hosp. v. Sebelius*, 893 F. Supp. 2d 172, 184 (D.D.C. 2012). The Secretary does not dispute this holding on appeal. Instead, the Secretary's opening brief states that "this Court

**B.     The Secretary Has Waived Any Argument That Columbia Saint Mary's Failed To Show Detrimental Reliance On The Secretary's Preexisting Policy.**

The Secretary argues that this Court must reverse the judgment of the district court that the Secretary's current interpretation of the phrase "not entitled to benefits under Part A of [Medicare]" in the Medicaid fraction may not be retroactively applied to Columbia Saint Mary's 1999 fiscal year, because Columbia Saint Mary's cannot demonstrate that it relied to its detriment on the Secretary's prior interpretation of the statutory language.    Appellant's Br. 13-14.    The Secretary, however, forfeited that argument when she elected not to raise it in the district court.

"It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal."   *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1084 (D.C. Cir. 1984); *see also Bain v. MJJ Prods., Inc.*, 751 F.3d 642, 649 (D.C. Cir. 2014); *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 22 (D.C. Cir. 2010) (arguments raised for the first time on appeal are forfeited).  If a party fails to raise an issue in the district court, "'it is not [this

---

need not determine whether the Secretary had a contrary policy before the *Edgewater* adjudication in 2000."  Appellant's Br. 13.  Thus, the Secretary may not argue for the first time in her reply brief that the district court erred in ruling that *Edgewater* effected a clear change in the Secretary's prior policy and practice.  *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("Issues may not be raised for the first time in a reply brief.") (citation omitted).

Court's normal] practice to entertain issues first raised on appeal.'" *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 663 (D.C. Cir. 1994) (deeming a hospital's arguments waived because it "failed both in the district court and before the Board to raise [them]") (quoting *Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 419 & n.5 (D.C. Cir. 1992)).  As the record shows, the Secretary never raised the issue in the district court, even when Judge Jackson expressly asked her to address the effects of Judge Lamberth's holding in *Catholic Health* that the Secretary's new interpretation could not be retroactively applied.  Therefore, that argument is waived and the Secretary should not be permitted to raise it belatedly on appeal.

After Judge Lamberth issued his opinion in *Catholic Health*—holding that "the Secretary's *Edgewater* decision, as well as her 2004 final rule, . . . effected a substantive change from HHS's policies and practices with respect to the DSH calculation" and that, therefore, "the Secretary's current interpretation may not be retroactively applied," 841 F. Supp. 2d at 282—the district judge presiding over this case (Judge Jackson) ordered Columbia Saint Mary's and the Secretary to file briefs addressing the effects of the *Catholic Health* district court decision on this case.

Columbia Saint Mary's argued that *Catholic Health* was directly applicable and supported summary judgment for Columbia Saint Mary's.  Dkt. 32 at 6, 9,

JA_.  In making this point, Columbia Saint Mary's expressly called attention to the way in which the rule announced in *Edgewater* in 2000 was being retroactively applied in an improper way:  "the *Catholic Health* court established that the Secretary's change in policy and practice occurred in June 2000, and that attempts to apply this 'new policy' to cost reporting years prior to 2000 constituted impermissible retroactive rulemaking."  *Id.* at 10, JA_.

The Secretary took the position that Judge Lamberth's *Catholic Health* decision was wrongly decided and should not be followed.  However, the Secretary did *not* argue that Columbia Saint Mary's bore the burden of showing detrimental reliance on a prior policy or that Columbia Saint Mary's was otherwise precluded from challenging the retroactive application of the new interpretation announced in *Edgewater*.  Instead, the Secretary simply argued that Judge Lamberth's holding was incorrect because she maintained the "Secretary *never* had a policy and practice of *including* exhausted inpatient hospital coverage days in the Medicaid fraction, in 1995 or any other year."  Dkt. 30 at 7, JA_.  Therefore, the Secretary argued, "there was no [genuine] retroactivity issue in *Catholic Health* and there is no retroactivity issue in this case with regard to application of the Secretary's interpretation of the Medicaid fraction to fiscal years preceding 2000."  *Id.* at 17, JA_.  Indeed, the Secretary had the opportunity to raise the issue of detrimental reliance in two separate briefs filed with the district court.  Dkts. 30, 33, JA_.  The

Secretary never argued that Columbia Saint Mary's failed to show that it detrimentally relied on a prior policy or practice.  Instead, she doubled down on her argument that *Catholic Health* was wrongly decided and that there was no established prior policy or practice before *Edgewater* was decided in 2000.  *See* Dkt. 33 at 4-10, JA_.

Now the Secretary seeks to raise the issue of detrimental reliance for the first time on appeal.  Appellant's Br. 13-17.  But she cannot now attack Judge Jackson's ruling for failing to rule in her favor based on an issue that she never raised.  Her failure to raise the issue of detrimental reliance in district court precludes her from attacking the district court's judgment on that ground on appeal.

C.  **At A Minimum, This Court Should Remand With Instructions To Remand To The Agency So That Columbia Saint Mary's May Have An Opportunity To Show Its Detrimental Reliance On The Secretary's Preexisting Policy.**

The Secretary has been aware of her appellate waiver since this Court's *Catholic Health* decision.  718 F.3d at 922 n.6.  The issue also was prominently featured in Columbia Saint Mary's motion to govern briefs filed in this Court.  The Secretary, however, does not address the waiver head-on in her Appellant's brief.  Nor does she assert any exceptional circumstances that might warrant relief from her waiver.  *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d at 419 n.5.  Therefore, the Court should enforce the Secretary's waiver, reach the issue of whether *Edgewater* was an abrupt change from an established practice, hold that it

- 37 -

was, and affirm the district court's judgment.  However, if this Court were to relieve the Secretary of the waiver and allow her to raise the issue of detrimental reliance at this late stage in the proceedings, then it would be appropriate for this Court to remand to the district court with instructions to remand to the agency in order to provide Columbia Saint Mary's with an opportunity to show its detrimental reliance on the clear preexisting policy.

This Court has made clear that, when an issue (not subject to waiver) is uncontested in the district court and arises for the first time on appeal, rather than decide the merits of the issue on appeal, a remand to the district court is often necessary.  *See Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1029 (D.C. Cir. 1999); *Democratic Senatorial Campaign Comm. v. FEC*, 139 F.3d 951, 952 (D.C. Cir. 1998) ("*DSCC*").  This is especially true where the factual record has not been developed with respect to the issue first raised on appeal.  *See Trans-Pacific Policing Agreement*, 177 F.3d at 1029 (concluding that the court's decision to remand was consistent with previous cases in which "this court has remanded for further development of the record in light of matters that did not arise until the case was in this court on appeal"); *DSCC*, 139 F.3d at 952 (remanding to the district court because an issue "reared up only on appeal" due to an intervening case decision and "the factual record compiled in the district court [was] inadequate to the task" of resolving the issue on appeal).

- 38 -

The Secretary asserts that it would be futile to allow Columbia Saint Mary's to advance a claim of detrimental reliance because it is unlikely that Columbia Saint Mary's would have refused to continue treating a patient had it known that the patient's days would not be included in the Medicaid faction numerator. Appellant's Br. 16. However, contrary to the Secretary's assertion, Columbia Saint Mary's will be able to show detrimental reliance without taking the extreme position that it would have refused to treat a patient. This Court has recognized that detrimental reliance on a previous agency policy can be shown with evidence that the party explored (or refrained from exploring) new business opportunities in reliance on the previous policy, *Pub. Serv. Co. of Col. v. FERC*, 91 F.3d 1478, 1490 (D.C. Cir. 1996), or that the party "suffered some sort of competitive injury . . . that they had not anticipated" due to the change in policy. *Washington Water Power Co. v. FERC*, 201 F.3d 497, 503 (D.C. Cir. 2000). Courts have also found sufficient reliance on prior agency policies where a party dispersed funds in reliance on the previous policy, *Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044, 1051 (5th Cir. 1998), or made financing decisions in reliance on the previous policy. *Buccaneer Point Estates, Inc. v. United States*, 729 F.2d 1297, 1299 (11th Cir. 1984). Thus, Columbia Saint Mary's will be able to show detrimental reliance if it is given the opportunity to develop the factual record through administrative proceedings.

- 39 -

**D.    The Secretary's Argument That This Case Is Identical To *Catholic Health* Is Unavailing.**

**1.    The Entirety Of The Secretary's Argument Is That This Case Is Identical To *Catholic Health*.**

The Secretary's central—indeed, sole—argument is that this case is just like *Catholic Health*.  *E.g.*, Appellant's Br. 3 (identifying the issue on appeal as "[w]hether this Court's decision in *Catholic Health* mandates reversal of the district court's judgment for plaintiff in the present case").  According to the Secretary, this case and *Catholic Health* are indistinguishable and, therefore, this Court's holding in *Catholic Health* mandates reversal.  Appellant's Br. 11-12.  The Secretary's argument ignores what this Court actually said in *Catholic Health*.  As the *Catholic Health* panel explained, the plaintiff hospital in *Catholic Health* failed to argue the Secretary had waived the lack-of-detrimental-reliance argument.  Columbia Saint Mary's is making that waiver argument in this case.

The Secretary identifies two broadly worded legal questions answered by *Catholic Health* that she contends decide this case:  "(1) whether the Secretary's interpretation is at least permissible and entitled to deference; and (2) whether application of the Secretary's interpretation is impermissibly retroactive."  Appellant's Br. 2.  That framing is an attempt at misdirection.  The first question is not at issue here.  For the purposes of this appeal, it is irrelevant that the *Catholic Health* opinion held that the phrase "entitled to benefits under Part A" is

ambiguous or that the Secretary's current interpretation is permissible.  *Catholic Health* 718 F.3d at 270.  Columbia Saint Mary's argument does not challenge the substance of the Secretary's new interpretation, only her decision to apply that new interpretation retroactively to cost reports prior to 2000.  As for retroactive application of the *Edgewater* ruling, *Catholic Health* did not purport to decide that the Secretary could apply *Edgewater* to all cost reports prior to 2000.  To the contrary, *Catholic Health* found the Secretary's new interpretation could be applied *to the cost reports of the plaintiff hospital in that case* because the plaintiff hospital did not make the appellate waiver argument that Columbia Saint Mary's is making here.

> **2.    The Secretary Has Chosen To Make A Detrimental Reliance Argument That She Forfeited In The District Court, Despite Notice Of Her Waiver.**

The *Catholic Health* panel took pains to note that its narrow holding would not apply to a plaintiff hospital that argued that the Secretary had waived the detrimental reliance point.  718 F.3d at 922 n.6.  And when this Court ordered the parties to file motions to govern future proceedings regarding the effects of the *Catholic Health* decision, Columbia Saint Mary's told this Court and the Secretary that it would make the appellate waiver argument that the plaintiff hospital in *Catholic Health* did not make and, therefore, the Court should reach the question of whether *Edgewater* was an abrupt change in an established policy that could not

- 41 -

be applied retroactively to the hospital's 1999 cost report.  Pl. Mtn. at 8.  This Court ordered full briefing on the merits.

The Secretary's opening brief does not address what was said about her potential waiver in *Catholic Health* and in Columbia Saint Mary's motion to govern.  To the contrary, as explained above, the Secretary simply assumes there was no waiver and that she can attack the district court judgment on a ground that she never raised in the district court.

The only point the Secretary presents on the issue of waiver is a brief argument, without citation to any legal authority, that Columbia Saint Mary's "is precluded from arguing that the Secretary 'waived the right to argue lack of reliance.'"  Appellant's Br. 15 (quoting Pl. Mtn. 8).  Specifically, she contends Columbia Saint Mary's cannot argue lack of reliance because it "did not raise any argument regarding retroactive application of the Secretary's interpretation . . . until the [district] court requested supplemental briefing on the effect of *Catholic Health*."  Appellant's Br. 15.  That argument, however, ignores that the Secretary bore the burden of raising arguments against granting summary judgment in the district court.

As noted above, when the district court directed the parties to submit briefs regarding the effect of Judge Lamberth's *Catholic Health* decision, Columbia Saint Mary's argued that retroactive application of the new interpretation and rule

announced in *Edgewater* was impermissible. *See* Dkt. 32 at 9-10, JA_ ("[T]he *Catholic Health* [district] court established that the Secretary's change in policy and practice occurred in June 2000, and that attempts to apply this 'new policy' to cost reporting years prior to 2000 constituted impermissible retroactive rulemaking."). In the wake of the district court's order—and certainly after Columbia Saint Mary's presented its retroactivity argument—the Secretary had the obligation to raise any and all reasons to deny Columbia Saint Mary's summary judgment motion. *See Tarpley v. Greene*, 684 F.2d 1, 7 n.17 (D.C. Cir. 1982).

As explained, the Secretary did not argue for any reason that Columbia Saint Mary's was barred from seeking summary judgment based on *Catholic Health* and the retroactive application of *Edgewater*. The Secretary simply argued that Judge Lamberth's decision was incorrect and should not be followed. Plainly, if the Secretary wanted the district court to deny Columbia Saint Mary's request for summary judgment based on impermissible retroactivity—and to grant summary judgment in her favor based on lack of detrimental reliance (or for any other reason)—the Secretary had the obligation to raise that argument with the district court. She did not do so.

Because Columbia Saint Mary's raised the issue of retroactivity in the district court, and the district court based its opinion on that argument, Columbia Saint Mary's is not precluded from presenting a retroactivity argument on appeal.

- 43 -

By contrast, because the Secretary did not raise any arguments against retroactivity in the district court, including the detrimental reliance argument she now advances on appeal, she is barred from raising them on appeal. Had the Secretary raised the issue of detrimental reliance, the district court could have considered it along with Columbia Saint Mary's retroactivity argument. Because the Secretary did not raise the issue, she, not Columbia Saint Mary's, has waived it.[7]

> **3.    The Secretary's Opening Brief Does Not Come To Grips With Her Waiver Of The Detrimental Reliance Issue And Does Not Even Argue That The District Court Was Wrong When It Found That *Edgewater* Changed An Established Prior Policy.**

The Secretary's choice to frame this case as identical to *Catholic Health* has another important effect. She argues that this Court, like the *Catholic Health* panel, need not reach the question of whether *Edgewater* represented an abrupt change from an established prior policy. But her argument stops there, offers no alternative arguments, and does not contest the district court's explicit holding that *Edgewater* did change an established prior policy. Appellant's Br. 13-14. The

---

[7] Nor is Columbia Saint Mary's "precluded" from arguing that the Secretary waived the detrimental reliance argument because Columbia Saint Mary's "did not contend that it would have any acted differently" under the new interpretation. *See* Appellant's Br. 16. The reason Columbia Saint Mary's did not contend that it would have acted any differently under the new interpretation—*i.e.*, did not argue that it relied detrimentally on the prior interpretation—is precisely that the Secretary never raised the issue of detrimental reliance. Had the Secretary done so, Columbia Saint Mary's could have responded and the district court could have decided on that basis.

district court explicitly held "that before April 2000, the Secretary had a policy and practice of including unpaid Medicare benefits in the Medicaid numerator of the DSH calculation." 893 F. Supp. 2d at 184, JA_. And it went on to hold that "[i]t was not until 2000, with *Edgewater*, that the agency implemented a substantive change from that prior policy and practice, and began excluding unpaid Medicare days from the numerator." *Id.*

As discussed above, a review of the Secretary's past interpretations of the phrase "entitled to benefits under Part A of [Medicare]" indicates that the district courts in *Catholic Health* and in this case were correct to find that the Secretary had an established contrary policy prior to *Edgewater*. This Court expressly declined to reach the issue in deciding *Catholic Health*, but it is squarely presented here. The Secretary's opening brief, however, presents no argument on this point, and it would be inappropriate for the Secretary to raise any argument with respect to this issue for the first time in her reply brief. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("Issues may not be raised for the first time in a reply brief.") (citation omitted).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment to Columbia Saint Mary's. In the event that this Court concludes that the Secretary may raise the issue of detrimental reliance despite

- 45 -

failing to raise it before the district court, the case should be remanded to the district court with instructions to remand to the Secretary for factual development on that point.

August 13, 2014                    Respectfully submitted,


                                   /s/ *David J. Bird*
                                   _____

Salvatore G. Rotella, Jr.          David J. Bird
REED SMITH LLP                     Richard L. Heppner Jr.
Three Logan Square                 M. Patrick Yingling
1717 Arch Street, Suite 3100       REED SMITH LLP
Philadelphia, PA 19103             Reed Smith Centre
Tel: 215.851.8123                  225 Fifth Avenue
Fax: 215.851.1420                  Pittsburgh, PA 15222
srotella@reedsmith.com             Tel: 412.288.3131
                                   Fax: 412.288.3063
                                   dbird@reedsmith.com
                                   rheppner@reedsmith.com
                                   mpyingling@reedsmith.com


*Counsel for Appellee Columbia Saint Mary's Hospital Milwaukee, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(c), I hereby certify that the foregoing brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. 32(a)(6).  The word processing program (Microsoft Word 2010) used to prepare the brief reports that the brief is 10,854 words long.  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with Times New Roman, 14 point font.


August 13, 2014                              /s/ *David J. Bird*
                                             _____

                                             David J. Bird

## CERTIFICATE OF SERVICE

I certify that, on this day, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I also certify that I have sent five printed copies of the brief to the Court by third-party courier for delivery within two business days.

I further certify that, on this day, I served the foregoing brief by electronic service via the CM/ECF system.


August 13, 2014                    /s/ *David J. Bird*

                    David J. Bird

# ADDENDUM

# TABLE OF CONTENTS

**Page**

42 U.S.C. § 1395ww(d)(5)......................................................................A1

51 Fed. Reg. 16772, 16777 (May 6, 1986) ............................................A8

51 Fed. Reg. 31454, 31460-61 (Sept. 3, 1986)....................................A10

55 Fed. Reg. 35990, 35996 (Sept. 4, 1990) .........................................A13

60 Fed. Reg. 45778, 45811 (Sept. 1, 1995) .........................................A15

69 Fed. Reg. 48916, 49098-99 (Aug. 11, 2004) ..................................A17

subparagraph (C)(i) or in applying budget neutrality under subparagraph (C)(iii).

(5)(A)(i) For discharges occurring during fiscal years ending on or before September 30, 1997, the Secretary shall provide for an additional payment for a subsection (d) hospital for any discharge in a diagnosis-related group, the length of stay of which exceeds the mean length of stay for discharges within that group by a fixed number of days, or exceeds such mean length of stay by some fixed number of standard deviations, whichever is the fewer number of days.

(ii) For cases which are not included in clause (i), a subsection (d) hospital may request additional payments in any case where charges, adjusted to cost, exceed a fixed multiple of the applicable DRG prospective payment rate, or exceed such other fixed dollar amount, whichever is greater, or, for discharges in fiscal years beginning on or after October 1, 1994, exceed the sum of the applicable DRG prospective payment rate plus any amounts payable under subparagraphs (B) and (F) plus a fixed dollar amount determined by the Secretary.

(iii) The amount of such additional payment under clauses (i) and (ii) shall be determined by the Secretary and shall (except as payments under clause (i) are required to be reduced to take into account the requirements of clause (v)) approximate the marginal cost of care beyond the cutoff point applicable under clause (i) or (ii).

(iv) The total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.

(v) The Secretary shall provide that—

(I) the day outlier percentage for fiscal year 1995 shall be 75 percent of the day outlier percentage for fiscal year 1994;

(II) the day outlier percentage for fiscal year 1996 shall be 50 percent of the day outlier percentage for fiscal year 1994; and

(III) the day outlier percentage for fiscal year 1997 shall be 25 percent of the day outlier percentage for fiscal year 1994.

(vi) For purposes of this subparagraph, the term "day outlier percentage" means, for a fiscal year, the percentage of the total additional payments made by the Secretary under this subparagraph for discharges in that fiscal year which are additional payments under clause (i).

(B) The Secretary shall provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) under subsection (a)(2) of this section, except as follows:

(i) The amount of such additional payment shall be determined by multiplying (I) the sum of the amount determined under paragraph (1)(A)(ii)(II) (or, if applicable, the amount determined under paragraph (1)(A)(iii)) and, for cases qualifying for additional payment under subparagraph (A)(i), the amount paid to the hospital under subparagraph (A), by (II) the indirect teaching adjustment factor described in clause (ii).

(ii) For purposes of clause (i)(II), the indirect teaching adjustment factor is equal to c × (((1+r) to the nth power) −1), where "r" is the ratio of the hospital's full-time equivalent interns and residents to beds and "n" equals .405. Subject to clause (ix), for discharges occurring—

(I) on or after October 1, 1988, and before October 1, 1997, "c" is equal to 1.89;

(II) during fiscal year 1998, "c" is equal to 1.72;

(III) during fiscal year 1999, "c" is equal to 1.6;

(IV) during fiscal year 2000, "c" is equal to 1.47;

(V) during fiscal year 2001, "c" is equal to 1.54;

(VI) during fiscal year 2002, "c" is equal to 1.6;

(VII) on or after October 1, 2002, and before April 1, 2004, "c" is equal to 1.35;

(VIII) on or after April 1, 2004, and before October 1, 2004, "c" is equal to 1.47;

(IX) during fiscal year 2005, "c" is equal to 1.42;

(X) during fiscal year 2006, "c" is equal to 1.37;

(XI) during fiscal year 2007, "c" is equal to 1.32; and

(XII) on or after October 1, 2007, "c" is equal to 1.35.

(iii) In determining such adjustment the Secretary shall not distinguish between those interns and residents who are employees of a hospital and those interns and residents who furnish services to a hospital but are not employees of such hospital.

(iv)(I) Effective for discharges occurring on or after October 1, 1997, and before July 1, 2010, all the time spent by an intern or resident in patient care activities under an approved medical residency training program at an entity in a nonhospital setting shall be counted towards the determination of full-time equivalency if the hospital incurs all, or substantially all, of the costs for the training program in that setting.

(II) Effective for discharges occurring on or after July 1, 2010, all the time spent by an intern or resident in patient care activities in a nonprovider setting shall be counted towards the determination of full-time equivalency if a hospital incurs the costs of the stipends and fringe benefits of the intern or resident during the time the intern or resident spends in that setting. If more than one hospital incurs these costs, either directly or through a third party, such hospitals shall count a proportional share of the time, as determined by written agreement between the hospitals, that a resident spends training in that setting.

(v) In determining the adjustment with respect to a hospital for discharges occurring on or after October 1, 1997, the total number of full-time equivalent interns and residents in the fields of allopathic and osteopathic medicine in either a hospital or nonhospital setting may not exceed the number (or, 130 percent of such number in the case of a hospital located in a rural area) of such full-time equivalent interns and residents in the hospital with re-

A1

spect to the hospital's most recent cost reporting period ending on or before December 31, 1996. Rules similar to the rules of subsection (h)(4)(F)(ii) of this section shall apply for purposes of this clause. The provisions of subsections (h)(4)(H)(vi), (h)(7), and (h)(8) of this section shall apply with respect to the first sentence of this clause in the same manner as they apply with respect to subsection (h)(4)(F)(i) of this section.

(vi) For purposes of clause (ii)—

(I) ''r'' may not exceed the ratio of the number of interns and residents, subject to the limit under clause (v), with respect to the hospital for its most recent cost reporting period to the hospital's available beds (as defined by the Secretary) during that cost reporting period, and

(II) for the hospital's cost reporting periods beginning on or after October 1, 1997, subject to the limits described in clauses (iv) and (v), the total number of full-time equivalent residents for payment purposes shall equal the average of the actual full-time equivalent resident count for the cost reporting period and the preceding two cost reporting periods.

In the case of the first cost reporting period beginning on or after October 1, 1997, subclause (II) shall be applied by using the average for such period and the preceding cost reporting period.

(vii) If any cost reporting period beginning on or after October 1, 1997, is not equal to twelve months, the Secretary shall make appropriate modifications to ensure that the average full-time equivalent residency count pursuant to subclause (II) of clause (vi) is based on the equivalent of full twelve-month cost reporting periods.

(viii) Rules similar to the rules of subsection (h)(4)(H) of this section shall apply for purposes of clauses (v) and (vi).

(ix) For discharges occurring on or after July 1, 2005, insofar as an additional payment amount under this subparagraph is attributable to resident positions redistributed to a hospital under subsection (h)(7)(B) of this section, in computing the indirect teaching adjustment factor under clause (ii) the adjustment shall be computed in a manner as if ''c'' were equal to 0.66 with respect to such resident positions.

(x)[6] For discharges occurring on or after July 1, 2011, insofar as an additional payment amount under this subparagraph is attributable to resident positions distributed to a hospital under subsection (h)(8)(B), the indirect teaching adjustment factor shall be computed in the same manner as provided under clause (ii) with respect to such resident positions.

(x)(I)[6] The provisions of subparagraph (K) of subsection (h)(4) shall apply under this subparagraph in the same manner as they apply under such subsection.

(II) In determining the hospital's number of full-time equivalent residents for purposes of

this subparagraph, all the time spent by an intern or resident in an approved medical residency training program in non-patient care activities, such as didactic conferences and seminars, as such time and activities are defined by the Secretary, that occurs in the hospital shall be counted toward the determination of full-time equivalency if the hospital—

(aa) is recognized as a subsection (d) hospital;

(bb) is recognized as a subsection (d) Puerto Rico hospital;

(cc) is reimbursed under a reimbursement system authorized under section 1395f(b)(3) of this title; or

(dd) is a provider-based hospital outpatient department.

(III) In determining the hospital's number of full-time equivalent residents for purposes of this subparagraph, all the time spent by an intern or resident in an approved medical residency training program in research activities that are not associated with the treatment or diagnosis of a particular patient, as such time and activities are defined by the Secretary, shall not be counted toward the determination of full-time equivalency.

(C)(i) The Secretary shall provide for such exceptions and adjustments to the payment amounts established under this subsection (other than under paragraph (9)) as the Secretary deems appropriate to take into account the special needs of regional and national referral centers (including those hospitals of 275 or more beds located in rural areas). A hospital which is classified as a rural hospital may appeal to the Secretary to be classified as a rural referral center under this clause on the basis of criteria (established by the Secretary) which shall allow the hospital to demonstrate that it should be so reclassified by reason of certain of its operating characteristics being similar to those of a typical urban hospital located in the same census region and which shall not require a rural osteopathic hospital to have more than 3,000 discharges in a year in order to be classified as a rural referral center. Such characteristics may include wages, scope of services, service area, and the mix of medical specialties. The Secretary shall publish the criteria not later than August 17, 1984, for implementation by October 1, 1984. An appeal allowed under this clause must be submitted to the Secretary (in such form and manner as the Secretary may prescribe) during the quarter before the first quarter of the hospital's cost reporting period (or, in the case of a cost reporting period beginning during October 1984, during the first quarter of that period), and the Secretary must make a final determination with respect to such appeal within 60 days after the date the appeal was submitted. Any payment adjustments necessitated by a reclassification based upon the appeal shall be effective at the beginning of such cost reporting period.

(ii) The Secretary shall provide, under clause (i), for the classification of a rural hospital as a regional referral center if the hospital has a case mix index equal to or greater than the median case mix index for hospitals (other than hos-

---

[6] So in original. Two cls. (x) have been enacted.

pitals with approved teaching programs) located in an urban area in the same region (as defined in paragraph (2)(D)), has at least 5,000 discharges a year or, if less, the median number of discharges in urban hospitals in the region in which the hospital is located (or, in the case of a rural osteopathic hospital, meets the criterion established by the Secretary under clause (i) with respect to the annual number of discharges for such hospitals), and meets any other criteria established by the Secretary under clause (i).

(D)(i) For any cost reporting period beginning on or after April 1, 1990, with respect to a subsection (d) hospital which is a sole community hospital, payment under paragraph (1)(A) shall be—

(I) an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C) of this section, or

(II) the amount determined under paragraph (1)(A)(iii),

whichever results in greater payment to the hospital.

(ii) In the case of a sole community hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, the Secretary shall provide for such adjustment to the payment amounts under this subsection (other than under paragraph (9)) as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services.

(iii) For purposes of this subchapter, the term "sole community hospital" means any hospital—

(I) that the Secretary determines is located more than 35 road miles from another hospital,

(II) that, by reason of factors such as the time required for an individual to travel to the nearest alternative source of appropriate inpatient care (in accordance with standards promulgated by the Secretary), location, weather conditions, travel conditions, or absence of other like hospitals (as determined by the Secretary), is the sole source of inpatient hospital services reasonably available to individuals in a geographic area who are entitled to benefits under part A of this subchapter, or

(III) that is located in a rural area and designated by the Secretary as an essential access community hospital under section 1395i–4(i)(1) of this title as in effect on September 30, 1997.

(iv) The Secretary shall promulgate a standard for determining whether a hospital meets the criteria for classification as a sole community hospital under clause (iii)(II) because of the time required for an individual to travel to the nearest alternative source of appropriate inpatient care.

(v) If the Secretary determines that, in the case of a hospital located in a rural area and designated by the Secretary as an essential access community hospital under section

1395i–4(i)(1) of this title as in effect on September 30, 1997, the hospital has incurred increases in reasonable costs during a cost reporting period as a result of becoming a member of a rural health network (as defined in section 1395i–4(d) of this title) in the State in which it is located, and in incurring such increases, the hospital will increase its costs for subsequent cost reporting periods, the Secretary shall increase the hospital's target amount under subsection (b)(3)(C) of this section to account for such incurred increases.

(E)(i) The Secretary shall estimate the amount of reimbursement made for services described in section 1395y(a)(14) of this title with respect to which payment was made under part B of this subchapter in the base reporting periods referred to in paragraph (2)(A) and with respect to which payment is no longer being made.

(ii) The Secretary shall provide for an adjustment to the payment for subsection (d) hospitals in each fiscal year so as appropriately to reflect the net amount described in clause (i).

(F)(i) Subject to subsection (r), for discharges occurring on or after May 1, 1986, the Secretary shall provide, in accordance with this subparagraph, for an additional payment amount for each subsection (d) hospital which—

(I) serves a significantly disproportionate number of low-income patients (as defined in clause (v)), or

(II) is located in an urban area, has 100 or more beds, and can demonstrate that its net inpatient care revenues (excluding any of such revenues attributable to this subchapter or State plans approved under subchapter XIX of this chapter), during the cost reporting period in which the discharges occur, for indigent care from State and local government sources exceed 30 percent of its total of such net inpatient care revenues during the period.

(ii) Subject to clause (ix), the amount of such payment for each discharge shall be determined by multiplying (I) the sum of the amount determined under paragraph (1)(A)(ii)(II) (or, if applicable, the amount determined under paragraph (1)(A)(iii)) and, for cases qualifying for additional payment under subparagraph (A)(i), the amount paid to the hospital under subparagraph (A) for that discharge, by (II) the disproportionate share adjustment percentage established under clause (iii) or (iv) for the cost reporting period in which the discharge occurs.

(iii) The disproportionate share adjustment percentage for a cost reporting period for a hospital described in clause (i)(II) is equal to 35 percent.

(iv) The disproportionate share adjustment percentage for a cost reporting period for a hospital that is not described in clause (i)(II) and that—

(I) is located in an urban area and has 100 or more beds or is described in the second sentence of clause (v), is equal to the percent determined in accordance with the applicable formula described in clause (vii);

(II) is located in an urban area and has less than 100 beds, is equal to 5 percent or, subject to clause (xiv) and for discharges occurring on or after April 1, 2001, is equal to the percent determined in accordance with clause (xiii);

A3

(III) is located in a rural area and is not described in subclause (IV) or (V) or in the second sentence of clause (v), is equal to 4 percent or, subject to clause (xiv) and for discharges occurring on or after April 1, 2001, is equal to the percent determined in accordance with clause (xii);

(IV) is located in a rural area, is classified as a rural referral center under subparagraph (C), and is classified as a sole community hospital under subparagraph (D), is equal to 10 percent or, if greater, the percent determined in accordance with the applicable formula described in clause (viii) or, subject to clause (xiv) and for discharges occurring on or after April 1, 2001, the greater of the percentages determined under clause (x) or (xi);

(V) is located in a rural area, is classified as a rural referral center under subparagraph (C), and is not classified as a sole community hospital under subparagraph (D), is equal to the percent determined in accordance with the applicable formula described in clause (viii) or, subject to clause (xiv) and for discharges occurring on or after April 1, 2001, is equal to the percent determined in accordance with clause (xi); or

(VI) is located in a rural area, is classified as a sole community hospital under subparagraph (D), and is not classified as a rural referral center under subparagraph (C), is 10 percent or, subject to clause (xiv) and for discharges occurring on or after April 1, 2001, is equal to the percent determined in accordance with clause (x).

(v) In this subparagraph, a hospital ''serves a significantly disproportionate number of low income patients'' for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals, or exceeds—

(I) 15 percent, if the hospital is located in an urban area and has 100 or more beds,

(II) 30 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and has more than 100 beds, or is located in a rural area and is classified as a sole community hospital under subparagraph (D),

(III) 40 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in an urban area and has less than 100 beds, or

(IV) 45 percent (or 15 percent, for discharges occurring on or after April 1, 2001), if the hospital is located in a rural area and is not described in subclause (II).

A hospital located in a rural area and with 500 or more beds also ''serves a significantly disproportionate number of low income patients'' for a cost reporting period if the hospital has a disproportionate patient percentage (as defined in clause (vi)) for that period which equals or exceeds a percentage specified by the Secretary.

(vi) In this subparagraph, the term ''disproportionate patient percentage'' means, with respect to a cost reporting period of a hospital, the sum of—

(I) the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

(II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under subchapter XI.

(vii) The formula used to determine the disproportionate share adjustment percentage for a cost reporting period for a hospital described in clause (iv)(I) is—

(I) in the case of such a hospital with a disproportionate patient percentage (as defined in clause (vi)) greater than 20.2—

(a) for discharges occurring on or after April 1, 1990, and on or before December 31, 1990, $(P - 20.2)(.65) + 5.62$,

(b) for discharges occurring on or after January 1, 1991, and on or before September 30, 1993, $(P - 20.2)(.7) + 5.62$,

(c) for discharges occurring on or after October 1, 1993, and on or before September 30, 1994, $(P - 20.2)(.8) + 5.88$, and

(d) for discharges occurring on or after October 1, 1994, $(P - 20.2)(.825) + 5.88$; or

(II) in the case of any other such hospital—

(a) for discharges occurring on or after April 1, 1990, and on or before December 31, 1990, $(P - 15)(.6) + 2.5$,

(b) for discharge occurring on or after January 1, 1991, and on or before September 30, 1993, $(P - 15)(.6) + 2.5$,[7]

(c) for discharges occurring on or after October 1, 1993, $(P - 15)(.65) + 2.5$,

where ''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(viii) Subject to clause (xiv), the formula used to determine the disproportionate share adjustment percentage for a cost reporting period for a hospital described in clause (iv)(IV) or (iv)(V) is the percentage determined in accordance with the following formula: $(P - 30)(.6) + 4.0$, where

_____

[7] So in original. Probably should be followed by ''and''.

A4

''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(ix) In the case of discharges occurring—

(I) during fiscal year 1998, the additional payment amount otherwise determined under clause (ii) shall be reduced by 1 percent;

(II) during fiscal year 1999, such additional payment amount shall be reduced by 2 percent;

(III) during fiscal years 2000 and 2001, such additional payment amount shall be reduced by 3 percent and 2 percent, respectively;

(IV) during fiscal year 2002, such additional payment amount shall be reduced by 3 percent; and

(V) during fiscal year 2003 and each subsequent fiscal year, such additional payment amount shall be reduced by 0 percent.

(x) Subject to clause (xiv), for purposes of clause (iv)(VI) (relating to sole community hospitals), in the case of a hospital for a cost reporting period with a disproportionate patient percentage (as defined in clause (vi)) that—

(I) is less than 19.3, the disproportionate share adjustment percentage is determined in accordance with the following formula: $(P-15)(.65) + 2.5$;

(II) is equal to or exceeds 19.3, but is less than 30.0, such adjustment percentage is equal to 5.25 percent; or

(III) is equal to or exceeds 30, such adjustment percentage is equal to 10 percent,

where ''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(xi) Subject to clause (xiv), for purposes of clause (iv)(V) (relating to rural referral centers), in the case of a hospital for a cost reporting period with a disproportionate patient percentage (as defined in clause (vi)) that—

(I) is less than 19.3, the disproportionate share adjustment percentage is determined in accordance with the following formula: $(P-15)(.65) + 2.5$;

(II) is equal to or exceeds 19.3, but is less than 30.0, such adjustment percentage is equal to 5.25 percent; or

(III) is equal to or exceeds 30, such adjustment percentage is determined in accordance with the following formula: $(P-30)(.6) + 5.25$,

where ''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(xii) Subject to clause (xiv), for purposes of clause (iv)(III) (relating to small rural hospitals generally), in the case of a hospital for a cost reporting period with a disproportionate patient percentage (as defined in clause (vi)) that—

(I) is less than 19.3, the disproportionate share adjustment percentage is determined in accordance with the following formula: $(P-15)(.65) + 2.5$; or

(II) is equal to or exceeds 19.3, such adjustment percentage is equal to 5.25 percent,

where ''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(xiii) Subject to clause (xiv), for purposes of clause (iv)(II) (relating to urban hospitals with less than 100 beds), in the case of a hospital for a cost reporting period with a disproportionate patient percentage (as defined in clause (vi)) that—

(I) is less than 19.3, the disproportionate share adjustment percentage is determined in accordance with the following formula: $(P-15)(.65) + 2.5$; or

(II) is equal to or exceeds 19.3, such adjustment percentage is equal to 5.25 percent,

where ''P'' is the hospital's disproportionate patient percentage (as defined in clause (vi)).

(xiv)(I) In the case of discharges occurring on or after April 1, 2004, subject to subclause (II), there shall be substituted for the disproportionate share adjustment percentage otherwise determined under clause (iv) (other than subclause (I)) or under clause (viii), (x), (xi), (xii), or (xiii), the disproportionate share adjustment percentage determined under clause (vii) (relating to large, urban hospitals).

(II) Under subclause (I), the disproportionate share adjustment percentage shall not exceed 12 percent for a hospital that is not classified as a rural referral center under subparagraph (C) or, in the case of discharges occurring on or after October 1, 2006, as a medicare-dependent, small rural hospital under subparagraph (G)(iv).

(G)(i) For any cost reporting period beginning on or after April 1, 1990, and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2012, in the case of a subsection (d) hospital which is a medicare-dependent, small rural hospital, payment under paragraph (1)(A) shall be equal to the sum of the amount determined under clause (ii) and the amount determined under paragraph (1)(A)(iii).

(ii) The amount determined under this clause is—

(I) for discharges occurring during the 36-month period beginning with the first day of the cost reporting period that begins on or after April 1, 1990, the amount by which the hospital's target amount for the cost reporting period (as defined in subsection (b)(3)(D) of this section) exceeds the amount determined under paragraph (1)(A)(iii); and

(II) for discharges occurring during any subsequent cost reporting period (or portion thereof) and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2012, 50 percent (or 75 percent in the case of discharges occurring on or after October 1, 2006) of the amount by which the hospital's target amount for the cost reporting period or for discharges in the fiscal year (as defined in subsection (b)(3)(D) of this section) exceeds the amount determined under paragraph (1)(A)(iii).

(iii) In the case of a medicare dependent, small rural hospital that experiences, in a cost reporting period compared to the previous cost reporting period, a decrease of more than 5 percent in its total number of inpatient cases due to circumstances beyond its control, the Secretary shall provide for such adjustment to the payment amounts under this subsection (other than under paragraph (9)) as may be necessary to fully compensate the hospital for the fixed costs it incurs in the period in providing inpatient hospital services, including the reasonable cost of maintaining necessary core staff and services.

(iv) The term ''medicare-dependent, small rural hospital'' means, with respect to any cost

reporting period to which clause (i) applies, any hospital—

(I) located in a rural area,

(II) that has not more than 100 beds,

(III) that is not classified as a sole community hospital under subparagraph (D), and

(IV) for which not less than 60 percent of its inpatient days or discharges during the cost reporting period beginning in fiscal year 1987, or two of the three most recently audited cost reporting periods for which the Secretary has a settled cost report, were attributable to inpatients entitled to benefits under part A of this subchapter.

(H) The Secretary may provide for such adjustments to the payment amounts under this subsection as the Secretary deems appropriate to take into account the unique circumstances of hospitals located in Alaska and Hawaii.

(I)(i) The Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate.

(ii) In making adjustments under clause (i) for transfer cases (as defined by the Secretary) in a fiscal year, not taking in account the effect of subparagraph (J), the Secretary may make adjustments to each of the average standardized amounts determined under paragraph (3) to assure that the aggregate payments made under this subsection for such fiscal year are not greater or lesser than those that would have otherwise been made in such fiscal year.

(J)(i) The Secretary shall treat the term "transfer case" (as defined in subparagraph (I)(ii)) as including the case of a qualified discharge (as defined in clause (ii)), which is classified within a diagnosis-related group described in clause (iii), and which occurs on or after October 1, 1998. In the case of a qualified discharge for which a substantial portion of the costs of care are incurred in the early days of the inpatient stay (as defined by the Secretary), in no case may the payment amount otherwise provided under this subsection exceed an amount equal to the sum of—

(I) 50 percent of the amount of payment under this subsection for transfer cases (as established under subparagraph (I)(i)), and

(II) 50 percent of the amount of payment which would have been made under this subsection with respect to the qualified discharge if no transfer were involved.

(ii) For purposes of clause (i), subject to clause (iii), the term "qualified discharge" means a discharge classified with a diagnosis-related group (described in clause (iii)) of an individual from a subsection (d) hospital, if upon such discharge the individual—

(I) is admitted as an inpatient to a hospital or hospital unit that is not a subsection (d) hospital for the provision of inpatient hospital services;

(II) is admitted to a skilled nursing facility;

(III) is provided home health services from a home health agency, if such services relate to the condition or diagnosis for which such individual received inpatient hospital services from the subsection (d) hospital, and if such services are provided within an appropriate period (as determined by the Secretary); or

(IV) for discharges occurring on or after October 1, 2000, the individual receives post discharge services described in clause (iv)(I).

(iii) Subject to clause (iv), a diagnosis-related group described in this clause is—

(I) 1 of 10 diagnosis-related groups selected by the Secretary based upon a high volume of discharges classified within such groups and a disproportionate use of post discharge services described in clause (ii); and

(II) a diagnosis-related group specified by the Secretary under clause (iv)(II).

(iv) The Secretary shall include in the proposed rule published under subsection (e)(5)(A) of this section for fiscal year 2001, a description of the effect of this subparagraph. The Secretary may include in the proposed rule (and in the final rule published under paragraph (6)) for fiscal year 2001 or a subsequent fiscal year, a description of—

(I) post-discharge services not described in subclauses (I), (II), and (III) of clause (ii), the receipt of which results in a qualified discharge; and

(II) diagnosis-related groups described in clause (iii)(I) in addition to the 10 selected under such clause.

(K)(i) Effective for discharges beginning on or after October 1, 2001, the Secretary shall establish a mechanism to recognize the costs of new medical services and technologies under the payment system established under this subsection. Such mechanism shall be established after notice and opportunity for public comment (in the publications required by subsection (e)(5) of this section for a fiscal year or otherwise). Such mechanism shall be modified to meet the requirements of clause (viii).

(ii) The mechanism established pursuant to clause (i) shall—

(I) apply to a new medical service or technology if, based on the estimated costs incurred with respect to discharges involving such service or technology, the DRG prospective payment rate otherwise applicable to such discharges under this subsection is inadequate (applying a threshold specified by the Secretary that is the lesser of 75 percent of the standardized amount (increased to reflect the difference between cost and charges) or 75 percent of one standard deviation for the diagnosis-related group involved);

(II) provide for the collection of data with respect to the costs of a new medical service or technology described in subclause (I) for a period of not less than two years and not more than three years beginning on the date on which an inpatient hospital code is issued with respect to the service or technology;

(III) provide for additional payment to be made under this subsection with respect to discharges involving a new medical service or technology described in subclause (I) that occur during the period described in subclause (II) in an amount that adequately reflects the estimated average cost of such service or technology; and

(IV) provide that discharges involving such a service or technology that occur after the close of the period described in subclause (II)

will be classified within a new or existing diagnosis-related group with a weighting factor under paragraph (4)(B) that is derived from cost data collected with respect to discharges occurring during such period.

(iii) For purposes of clause (ii)(II), the term ''inpatient hospital code'' means any code that is used with respect to inpatient hospital services for which payment may be made under this subsection and includes an alphanumeric code issued under the International Classification of Diseases, 9th Revision, Clinical Modification (''ICD–9–CM'') and its subsequent revisions.

(iv) For purposes of clause (ii)(III), the term ''additional payment'' means, with respect to a discharge for a new medical service or technology described in clause (ii)(I), an amount that exceeds the prospective payment rate otherwise applicable under this subsection to discharges involving such service or technology that would be made but for this subparagraph.

(v) The requirement under clause (ii)(III) for an additional payment may be satisfied by means of a new-technology group (described in subparagraph (L)), an add-on payment, a payment adjustment, or any other similar mechanism for increasing the amount otherwise payable with respect to a discharge under this subsection. The Secretary may not establish a separate fee schedule for such additional payment for such services and technologies, by utilizing a methodology established under subsection (a) or (h) of section 1395m of this title to determine the amount of such additional payment, or by other similar mechanisms or methodologies.

(vi) For purposes of this subparagraph and subparagraph (L), a medical service or technology will be considered a ''new medical service or technology'' if the service or technology meets criteria established by the Secretary after notice and an opportunity for public comment.

(vii) Under the mechanism under this subparagraph, the Secretary shall provide for the addition of new diagnosis and procedure codes in April 1 of each year, but the addition of such codes shall not require the Secretary to adjust the payment (or diagnosis-related group classification) under this subsection until the fiscal year that begins after such date.

(viii) The mechanism established pursuant to clause (i) shall be adjusted to provide, before publication of a proposed rule, for public input regarding whether a new service or technology represents an advance in medical technology that substantially improves the diagnosis or treatment of individuals entitled to benefits under part A of this subchapter as follows:

(I) The Secretary shall make public and periodically update a list of all the services and technologies for which an application for additional payment under this subparagraph is pending.

(II) The Secretary shall accept comments, recommendations, and data from the public regarding whether the service or technology represents a substantial improvement.

(III) The Secretary shall provide for a meeting at which organizations representing hospitals, physicians, such individuals, manufacturers, and any other interested party may present comments, recommendations, and

data to the clinical staff of the Centers for Medicare & Medicaid Services before publication of a notice of proposed rulemaking regarding whether service or technology represents a substantial improvement.

(ix) Before establishing any add-on payment under this subparagraph with respect to a new technology, the Secretary shall seek to identify one or more diagnosis-related groups associated with such technology, based on similar clinical or anatomical characteristics and the cost of the technology. Within such groups the Secretary shall assign an eligible new technology into a diagnosis-related group where the average costs of care most closely approximate the costs of care of using the new technology. No add-on payment under this subparagraph shall be made with respect to such new technology and this clause shall not affect the application of paragraph (4)(C)(iii).

(L)(i) In establishing the mechanism under subparagraph (K), the Secretary may establish new-technology groups into which a new medical service or technology will be classified if, based on the estimated average costs incurred with respect to discharges involving such service or technology, the DRG prospective payment rate otherwise applicable to such discharges under this subsection is inadequate.

(ii) Such groups—

(I) shall not be based on the costs associated with a specific new medical service or technology; but

(II) shall, in combination with the applicable standardized amounts and the weighting factors assigned to such groups under paragraph (4)(B), reflect such cost cohorts as the Secretary determines are appropriate for all new medical services and technologies that are likely to be provided as inpatient hospital services in a fiscal year.

(iii) The methodology for classifying specific hospital discharges within a diagnosis-related group under paragraph (4)(A) or a new-technology group shall provide that a specific hospital discharge may not be classified within both a diagnosis-related group and a new-technology group.

(6) The Secretary shall provide for publication in the Federal Register, on or before the August 1 before each fiscal year (beginning with fiscal year 1984), of a description of the methodology and data used in computing the adjusted DRG prospective payment rates under this subsection, including any adjustments required under subsection (e)(1)(B) of this section.

(7) There shall be no administrative or judicial review under section 1395oo of this title or otherwise of—

(A) the determination of the requirement, or the proportional amount, of any adjustment effected pursuant to subsection (e)(1) of this section or the determination of the applicable percentage increase under paragraph (12)(A)(ii),

(B) the establishment of diagnosis-related groups, of the methodology for the classification of discharges within such groups, and of the appropriate weighting factors thereof under paragraph (4), including the selection

USCA Case #13-5202    Document #1507744    Filed: 08/13/2014    Page 66 of 77

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Health Care Financing Administration

### 42 CFR Parts 400, 405, 412, and 489

[BERC-385-IFC]

### Medicare Program; Fiscal Year 1986 Changes to the Inpatient Hospital Prospective Payment System

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Interim final rule with comment period.

**SUMMARY:** This interim final rule sets forth revisions to the Medicare inpatient hospital prospective payment system. This rule is needed to implement those portions of sections 9101 through 9105, and 9112 of the Consolidated Omnibus Budget Reconciliation Act of 1985 having an effective date of May 1, 1986 or earlier. The changes required by this legislation affect the fiscal year 1986 prospective payment rates; the rate-of-increase limits (target amounts) for hospitals excluded from the prospective payment system; the length of the transition period and the method of payment; application of the hospital wage index; payment for the indirect costs of medical education; and payments for hospitals that serve a disproportionate share of low-income patients.

**DATES:** Effective date: With certain exceptions, this interim final rule is effective on May 1, 1986. We refer the reader to section VII.B. of this preamble for a detailed discussion of effective dates.

Comment Date: To be considered, comments must be mailed or delivered to the appropriate address, as provided below, and must be received by 5:00 p.m. on June 5, 1986.

**ADDRESS:** Mail comments to the following address: Health Care Financing Administration, Department of Health and Human Services, Attention: BERC-385-IFC, P.O. Box 26676, Baltimore, Maryland 21207.

If you prefer, you may deliver your comments to one of the following addresses:

Room 309-G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC, or

Room 132, East High Rise Building, 6325 Security Boulevard, Baltimore, Maryland.

In commenting, please refer to file code BERC-285-IFC. Comments received timely will be available for public inspection as they are received,

beginning approximately three weeks after publication of this document, in Room 309-G of the Department's offices at 200 Independence Avenue SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5:00 p.m. (phone: 202-245-7890).

**FOR FURTHER INFORMATION CONTACT:**
Linda Magno, (301) 594-9343.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On September 3, 1985, we published a final rule in the **Federal Register** (50 FR 35646) that made the following changes to the Medicare inpatient hospital prospective payment system:

• We adjusted the diagnosis-related groups (DRG) classifications and weighting factors for discharges occurring on or after October 1, 1985.

• For cost reporting periods beginning on or after October 1, 1983, we adopted a new hospital wage index that was based on the HCFA survey of hospital wages.

• We made several changes to the regulations in 42 CFR Parts 405 and 412 concerning—

—The rate-of-increase limits for hospitals excluded from the prospective payment system;

—Payments for indirect costs of medical education;

—Limitations on charges to beneficiaries for hospitals paid under State reimbursement control systems or demonstration projects;

—The exclusion of alcohol/drug hospitals and units;

—Review of cost outliers; and

—Qualifying criteria for referral centers.

• We established the FY 1986 Federal rates by—

—Restandardizing the base year cost data to reflect the new wage index;

—Grouping the standardized costs per case for urban/rural averages for the nine census regions and the nation, reflecting the most recent geopgraphic designations;

—Updating the standardized amounts by zero percent; and

—Applying the same adjustment factors for nonphysician anesthetist costs and outlier payments as were used for FY 1985.

• We did not increase either the hospital-specific rates for hospitals under the prospective payment system or the rate-of-increase limits for hospitals excluded from the prospective payment system.

With certain exceptions, the September 3 final rule was to be effective on October 1, 1985.

On September 30, 1985, the Emergency Extension Act of 1985 (Pub. L. 99-107) was enacted. Section 5 of Pub. L. 99-107 extended through November 14, 1985 the Medicare payment rates for inpatient hospital services that were in effect on September 30, 1985. A result of this delay was that certain changes in the rules that govern Medicare payment for inpatient hospital services, which would have become effective on October 1, 1985, for FY 1986 as a result of the September 3, 1985 final rule, were postponed initially until November 15, 1985. The affected changes concerned the rules for determining payment rates for hospitals covered by the prospective payment system and the rate-of-increase limits for hospitals excluded from that system. In addition, the amendments to 42 CFR 412.118(f)(2) and (f)(3) concerning determination of indirect medical education costs that were scheduled to be effective on October 1, 1985 under the September 3, 1985 final rule were also postponed until November 15, 1985. We announced this postponement in a notice in the **Federal Register** published on November 12, 1985 (50 FR 46651).

Since publication of that notice, several more laws were enacted that further delayed the implementation of revised Medicare inpatient hospital services payment rules as follows:

• Pub. L. 99-155, enacted December 14, 1985, extended the delay through December 14, 1985.

• Pub. L. 99-181, enacted December 13, 1985, extended the delay through December 18, 1985.

• Pub. L. 99-189, enacted December 18, 1985, extended the delay through December 19, 1985.

• Pub. L. 99-201 enacted December 23, 1985, extended the delay through March 14, 1986.

To announce the first of these extensions of the delay, we published a notice in the **Federal Register**, on December 6, 1985 (50 FR 49930); the remaining extensions were described in a notice published February 3, 1986 (51 FR 4166). The result of these extensions is that, for the period of the extension, we continued to pay for hospital discharges under the rules that were in effect in FY 1985. Thus, we did not implement the following changes that were included in the September 3, 1985 final rule:

• Revised DRG classifications and weights.

• Revised wage index.

• Revised adjusted standardized amounts.

• Revised regulations concerning exclusions on the count of interns and

A8

For purposes of determining a hospital's bed size, we are using the same definition that is currently used for determining number of beds for purposes of calculating the indirect medical education adjustment (§ 412.118(b)). That is, the number of beds in a hospital is determined by counting the number of available bed days during the hospital's cost reporting period, not including beds assigned to newborns, custodial care, and excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

Section 1886(d)(5)(F)(vi) states that the term "disproportionate patient percentage," which is used in the criterion implementing section 1886(d)(5)(F)(i)(I) and (v) of the Act, which is described above, means the sum of the following two fractions, which is expressed as a percentage:

1. Patient days of those patients entitled to both Medicare Part A and Supplemental Security Income (SSI) (excluding *those patients receiving State supplementation only)*

Patient days of those patients entitled to Medicare Part A

2. Patient days of those patients entitled to *Medicaid but not to Medicare Part A*

Total number of patient days

The number of patient days of those patients entitled to both Medicare Part A and SSI will be determined by matching data from the Medicare Part A Tape Bill (PATBILL) file with the Social Security Administration's (SSA's) SSI file. This match will be done at least annually and will involve a match of the individuals who are SSI recipients for each month during the Federal fiscal year in which the hospital's cost reporting period begins with the Medicare Part A beneficiaries who received inpatient hospital services during the same month. Thus, if a Medicare beneficiary is eligible for SSI benefits (excluding State supplementation only) during a month in which the beneficiary is a patient in the hospital, the covered Medicare Part A inpatient days of hospitalization in that month will be counted for the purpose of determining the hospital's disproportionate patient percentage. The match of SSI eligibility records to Medicare inpatient hospital days for a hospital will consist of counting the days in which Medicare inpatient hospital services are furnished during each month to patients entitled to both

Medicare Part A and SSI, summing those days, and dividing by the total number of days for which Medicare inpatient hospital services are furnished to all Medicare Part A beneficiaries in the hospital.

Although section 1886(d)(5)(F)(vi)(I) of the Act specifies that the match is done on a cost reporting period basis, we believe that matching Social Security numbers on a Federal fiscal year basis is the most feasible approach. A monthly match of SSI eligibility files to Medicare hospital records would be administratively more cumbersome and costly and could not be accomplished in a timely manner. Relying on Medicare billing records for the Federal fiscal year rather than the hospital cost reporting period avoids the problem of billing lag at the end of the cost reporting period. We do not believe that there are likely to be significant fluctuations from one year to the next in the percentage of patients served by the hospital who are dually entitled to Medicare Part A and SSI. Consequently, the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period.

However, we are affording all hospitals the option to determine their number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods. A hospital that avails itself of this option must furnish to its fiscal intermediary, in a manner and format to be prescribed by HCFA, data on its Medicare patients for its cost reporting period. These data will then be matched by SSA to determine those patients dually entitled to Medicare and SSI for the hospital's cost reporting period. The full cost of this process, including the cost of verification by SSA, will be borne by the hospital.

The number of patient days of those patients entitled to Medicaid but not to Medicare Part A will be determined by the hospital's Medicare fiscal intermediary based on Medicaid statistical data reported on the hospital's Medicare cost report. Total Medicaid inpatient days will include all covered days attributable to Medicaid patients including any inpatient days for Medicaid patients who are members of a health maintenance organization.

Section 1886(d)(5)(F)(vi)(II) of the Act describes Medicaid patient days at those". . . which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX . . . ." Therefore, Medicaid covered days will include only those days for which

benefits are payable under title XIX. Any day of a Medicaid patient's hospital stay that is not payable by the Medicaid program will not be counted as a Medicaid patient day since the patient is not considered eligible for Medicaid coverage on those days. For example, if a patient is hospitalized for 15 days and is eligible for Medicaid benefits for 10 of those days, only the 10 covered days will be considered Medicaid patient days for purposes of determining a hospital's disproportionate patient percentage.

The process we will use for making payments to hospitals that serve a disproprotionate share of low-income patients will be similar to the process we use to make the additional payment for the indirect medical education costs; that is, we will make interim payments based on the latest available data subject to a year-end settlement on a cost reporting period basis. For purposes of making these interim payments, the initial determination of a hospital's eligibility for this payment will be made by the hospital's Medicare fiscal intermediary based on Medicaid statistical data as reported on the hospital's most recent cost report and the SSI and Medicare data to be supplied by HCFA central office. If a hospital disagrees with the intermediary's determination of its Medicaid patient days, it will be the hospital's responsibility to demonstrate to the intermediary that the Medicaid statistics reported on its cost report are incorrect or were improperly applied. Medicaid data submitted by the hospital, whether on the cost report or furnished subsequently, are subject to intermediary audit to ensure their accuracy.

Sections 1886(d)(5)(f) (ii) and (iv) of the Act specify that the additional payment adjustment for hospitals that meet the disproportionate patient percentage criterion (section 1886(d)(5)(F)(i)(I) of the Act) is determined as follows:

• For urban hospitals with 100 or more beds, the hospital's total DRG revenue (as defined below) is increased by 2.5 percent plus one-half the difference between the hospital's percentage of low-income patients and 15 percent, up to a maximum of 15 percent; that is, the disproportionate share adjustment factor is the lesser of 15 percent or $(P-.15)(.5)+.025$, where P equals the hospital's disproportionate patient percentage expressed as a decimal.

• For urban hospitals with fewer than 100 beds, the hospital's total DRG revenue is increased by five percent.

A9

USCA Case #12-5378    Document #1507490    Filed: 08/15/2014    Page 68 of 77

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Care Financing Administration**

**42 CFR Parts 405 and 412**

**[BERC–353–F]**

**Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1987 Rates**

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule.

**SUMMARY:** We are amending the Medicare regulations governing the inpatient hospital prospective payment system to implement necessary changes arising from legislation and our continuing experience with the system.

In addition, we are describing changes in the methods, amounts, and factors necessary to determine prospective payment rates for Medicare inpatient hospital services. In general, these changes are applicable to discharges occurring on or after October 1, 1986. We are also setting forth the update factor for determining the rate-of-increase limits (target amounts) for hospitals excluded from the prospective payment system.

**EFFECTIVE DATE:** This final rule is effective on October 1, 1986. We refer the reader to section VI.A. of this preamble for a discussion of specific provisions that apply to specific periods.

**FOR FURTHER INFORMATION CONTACT:** Linda Magno, (301) 594–9343.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Summary of the Implementation of the Prospective Payment System*

Under section 1886(d) of the Social Security Act (the Act), enacted by the Social Security Amendments of 1983 (Pub. L. 98–21) on April 20, 1983, a prospective payment system for Medicare payment of inpatient hospital services was established effective with hospital cost reporting periods beginning on or after October 1, 1983. Under this system, Medicare payment is made at a predetermined, specific rate for each discharge. All discharges are classified according to a list of diagnosis-related groups (DRGs).

We published an interim final rule in the Federal Register (48 FR 39752) on September 1, 1983 to implement the prospective payment system effective with hospital cost reporting periods beginning on or after October 1, 1983.

Technical corrections for that rule were issued on October 19, 1983 (48 FR 48467).

On January 3, 1984, we issued a final rule (49 FR 234) to make changes resulting from our consideration of public comments that were received in response to the interim final rule. Technical corrections for that rule were issued on June 1, 1984 (49 FR 23010).

As a result of our first year of experience with the prospective payment system and to accommodate changes resulting from the enactment of the Deficit Reduction Act of 1984 (Pub. L. 98–369) on July 18, 1984, we published a final rule on August 31, 1984 (49 FR 34728) that further revised the prospective payment regulations. In addition, we made changes in the methods, amounts, and factors necessary to implement the second year of the transition period. Technical corrections for that final rule were issued on October 15, 1984 (49 FR 40167).

On March 29, 1985, we published a final rule (50 FR 12740) that redesignated the prospective payment regulations under a new 42 CFR Part 412. These regulations were previously located in 42 CFR 405.470 through 405.477.

Taking into consideration the recommendations made by the Prospective Payment Assessment Commission (PROPAC) under the authority of section 1886(d)(4)(D) of the Act, we published a final rule on September 3, 1985 (50 FR 35646) to implement the third year of the transition period. Technical corrections for that final rule were issued on October 28, 1985 (50 FR 43570). However, beginning on September 30, 1985, Congress enacted a series of statutory extensions of the hospital payment rates that were in effect on September 30, 1985. The effect was to delay implementation of the September 3, 1985 final rule with the result that the revised payment rates for hospitals covered by the prospective payment system and the rate-of-increase limits for hospitals excluded from that system, which were originally scheduled to be effective on October 1, 1985, were postponed through April 30, 1986. We notified the public about these extensions (50 FR 46651 and 49930, and 51 FR 4166) and, after the President signed the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. 99–272) into law on April 7, 1986, we issued an interim final rule with comment period on May 6, 1986 (51 FR 16772). That rule implemented new Federal fiscal year (FY) 1986 hospital payment rates effective for discharges occurring on or after May 1, 1986 for prospective payment hospitals and for cost reporting periods beginning on or

after October 1, 1985 for hospitals excluded from the prospective payment system.

The comment period for the interim final rule ended on June 5, 1986. We are responding to the comments received on that rule in section II of this preamble. Certain clarifying changes to the regulations, in response to the comments received on the interim final rule, are set forth in this document.

*B. Summary of June 3, 1986 Proposed Rule*

On June 3, 1986, we published a notice of proposed rulemaking (NPRM or proposed rule) in the Federal Register (51 FR 19970) to further amend the prospective payment system. We proposed to make the following changes:

• Under section 1886(a)(4) of the Act, we proposed to incorporate capital-related costs into the prospective payment system effective with cost reporting periods beginning in FY 1987. However, on July 2, 1986, Pub. L. 99–349 was enacted and included a provision (section 206) that amended section 1886(a)(4) of the Act to extend the period (through cost reporting periods beginning prior to October 1, 1987) during which capital-related costs must be treated separately from other inpatient hospital operating costs. Therefore, we are not incorporating capital-related costs into the prospective payment system in this final rule. Accordingly, we are not addressing in this final rule the comments we received concerning that proposal. However, we will consider the comments as we deliberate this matter further.

• We proposed to recompute the hospital market basket using data from a more recent base year (that is, "rebasing" the market basket) and to recalculate the weights of each of the components of the hospital market basket (that is, "reweighting" the market basket cost categories).

• We discussed several decisions and current provisions of the regulations in 42 CFR Parts 405 and 412, and set forth proposed changes concerning—

—Establishment of a base period for hospitals newly subject to the rate-of-increase ceiling;

—Extension of the exclusion for excluded alcohol/drug hospitals and units from the prospective payment system;

—Hospitals in redesignated rural counties which are surrounded on all sides by urban counties;

—Changes to referral center criteria; and

—Changes to the DRG classification system.

A10

These results indicate a high degree of correlation between SSI/Medicare percentages computed based on the Federal fiscal year and those computed by hospital cost reporting period. (A coefficient of 1.0 equals a perfect correlation.)

In addition, we also point out that for a significant proportion of hospitals within each of these groups, the SSI/Medicare ratio computed for Federal FY 1984 was within 2.3 percentage points (approximately one standard deviation of the mean difference) of the actual value derived from the hospital's own cost reporting period that began in Federal FY 1984, as shown below:

| Disproportionate share groups | Percentage [1] |
|---|---|
| Urban—100 or more beds | 95.5 |
| Urban—less than 100 beds | 81.4 |
| Rural | 80.5 |
| Overall | 86.9 |

[1] Percentage of hospitals whose SSI/Medicare ratio for Federal fiscal year 1984 is within .023 of the SSI/Medicare ratio for its cost reporting period beginning in Federal fiscal year 1984.

While the variability in the percentages is somewhat higher for the small urban hospital and rural hospital groups, generally only those hospitals in these two groups with overall disproportionate patient percentages that fall short by a small margin of meeting the necessary thresholds to qualify for an adjustment (that is, 40 percent and 45 percent, respectively) could be impacted. This is because the amount of the disproportionate share adjustment for qualifying hospitals in these two groups is not dependent on the amount of their disproportionate patient percentages.

We do not believe Congress intended to impose such a cumbersome and costly administrative burden as that described above in implementing this provision. The Secretary has general rulemaking authority under section 1102 and 1871 of the Act to deal with problems of implementing and administering the Act in an efficient manner. Based on the above discussion, we believe that using the Federal fiscal year instead of a hospital's own cost reporting period is the most feasible approach to implementing this provision in terms of accuracy, timeliness and cost efficiency. In addition, we believe we have complied with the law by affording hospitals the option of having their SSI/Medicare percentage computed based on its own cost reporting period.

*Comment:* Several commenters objected to our definition of Medicaid patient days for purposes of computing a hospital's disproportionate patient percentage. These commenters stated that all inpatient days associated with a Medicaid recipient should be counted whether or not the patient was actually covered by Medicaid for those days. These commenters focused on the term "patients who . . . were eligible for medical assistance . . ." in section 1886(d)(5)(F)(vi)(II) of the Act and argued that, since a patient would still be "eligible" for Medicaid benefits even though part or all of the patient's care may not be covered by Medicaid for a certain day, all patient days for which care was actually provided to a Medicaid eligible individual should be counted.

*Response:* We believe that the parenthetical phrase "for such days" in section 1886(d)(5)(F)(vi)(II) of the Act was intended to modify the phrase "eligible for medical assistance" and that Congress intended to include only such patient days for which the Medicaid patient was eligible to have his or her care paid for by the Medicaid program. We believe evidence of Congressional intent in this regard may be found in the legislative history of section 1886(d)(5)(F)(vi) of the Act.

The Conference Report described the House bill on section 9105 of Pub. L. 99–272 as defining low income patients as follows:

The proxy measure for low income would be the percentage of a hospital's total inpatient days attributable to medicaid patients (including medicaid-eligible medicare beneficiaries—medicare/medicaid crossovers).

(See H.R. Rep. No. 99–453, 99th Cong., 1st Sess. 459 (1985).) The phrase "inpatient days attributable to medicaid patients" supports the commenters' interpretation that all days that are attributable to Medicaid patients (that is, for which the patient is Medicaid-eligible) must be included in the numerator of the definition. However, the House bill's definition was not ultimately accepted by the Conference Committee. The Conference Report states that:

The percentage of low income patients will be defined as the total number of inpatient days attributable to Federal Supplemental Security Income beneficiaries divided by the total number of medicare patient days, plus the number of *medicaid patient days* divided by total patient days. (Emphasis added.)

(See H.R. Rep. No. 99–453, 99th Cong., 1st Sess. 461 (1985).) The substitution of the term "number of medicaid patient days" in the Conference agreement for the previous term "attributable to medicaid patients" suggests that Congress intended to adopt the definition as we currently understand it

(that is, only hospital days covered by Medicaid should be included in the numerator.) We believe that Congress consciously changed the focus of the Medicaid definition from the number of days that may be attributable to individuals eligible for Medicaid to the actual "number of Medicaid patient days" (that is, days that were paid for by the State's Medicaid program).

We believe this interpretation, that only Medicaid covered days should be counted, is not inconsistent with the statutory scheme as a whole, since the formula in section 1886(d)(5)(F)(vi) of the Act does not purport to identify all indigent patients. Rather, it refers to certain Medicare and Medicaid patients as an easily and objectively determined proxy for the indigent. Thus, under any reading of the statute, not all indigent patients are included in the formula. A Medicaid recipient who has exhausted his or her benefits is thus situated similarly to the indigent patient who is not eligible for Medicaid at all, and so it is logical to treat them the same for purposes of determining the disproportionate patient percentage.

In addition, given the relatively short timeframe for implementing section 1886(d)(5)(F)(vi) of the Act, we believe it is reasonable to assume that Congress anticipated that the Medicare cost report would serve as the primary source for Medicaid patient day statistics. Our definition of Medicaid patient days is consistent with the way we require Medicaid days to be reported on the Medicare cost report. On that form, a day of care is designated a Medicaid patient day only if the Medicaid program is the primary payor. There is no provision on the form for a patient day being counted as more than one type for payment purposes. We do not believe that Congress intended that an additional reporting mechanism, possibly tied to State eligibility records, be developed to obtain Medicaid statistics on noncovered patient days.

Therefore, since Congress clearly intended that the disproportionate share adjustment be implemented promptly with the data currently available, we believe the definition of Medicaid patient days published in the interim final rule is the one that Congress intended that we adopt.

We should also point out that our interpretation that the Medicaid portion of the definition of the disproportionate share percentage under section 1886(d)(5)(F)(vi)(II) of the Act refers only to Medicaid covered days is consistent with our interpretation of the Medicare portion under section 1886(d)(5)(F)(vi)(I) of the Act, (which uses similar language)

to refer only to Medicare covered days. In the preamble to the interim final rule, we indicated that we would count "covered" Medicare days in determining the Medicare portion of a hospital's disproportionate patient percentage. However, we received no comments on this issue.

## D. Other Comments

*Comment:* One commenter believes that a 30-day comment period does not provide enough time for the public to comment on rule changes to a program as important as the prospective payment system. The commenter would prefer a 60-day comment period. In addition, the commenter is concerned that comments are considered only if they are received by HCFA by the end of the indicated comment period. Since commenters have no control over the date a comment is received, HCFA should consider all comments postmarked by the end of the comment period.

*Response:* It was important that we move quickly to inform the public as soon as possible about the provisions of Pub. L. 99–272 that affected implementation of the prospective payment system during FY 1986. Congress authorized issuance of an interim final rule (section 9115(b) of Pub. L. 99–272), and mandated the effective date of the provisions dealt with in the interim final rule. In addition, under section 1886(e)(5)(B) of the Act, we were required to issue the proposed update for the prospective payment system for FY 1987 by June 1, 1986 and the final rule by September 1, 1986.

As indicated in section I of this preamble, this leaves no time for a comment period of longer than 30 days on the proposed updates. Therefore, in order to deal with the comments on the Pub. L. 99–272 interim final rule and the proposed FY 1987 update in an organized sequential manner, we established the 30-day comment period for the interim final rule. A 60-day comment period would have meant that the comment periods for both the interim final rule and the proposed FY 1987 update would have ended virtually simultaneously. This in turn would have meant that we would have been required to address comments on both documents at the same time, thereby complicating the process of meeting the September 1, 1986 statutory deadline for publication of the FY 1987 final rule.

As discussed above, we normally provide a 60-day comment period if circumstances permit it. However, given the need to issue regulations to implement Pub. L. 99–272 quickly combined with the imminent publication of the FY 1987 prospective payment

proposal, we determined that a 30-day comment period was necessary. We also point out that, for the most part, those provisions in Pub. L. 99–272 affecting the prospective payment system in FY 1986 were ones about which we had little administrative discretion concerning their substance or implementation. Therefore, a longer public comment period for those provisions would have been unnecessary. In addition, although there is no specified minimum time for the length of a public comment period, the courts have consistently held that a 30-day comment period is sufficient.

With regard to how the comment period date is applied, we consider to be timely only those comments that are received by the last day of the comment period rather than those postmarked by the last day of the comment period because postmarks are not always a reliable indicator of when a comment was sent. In many cases, the postmark is illegible and thus cannot be used to prove when a comment was sent. Also, for those commenters who use a postal meter outside the post office, a meter may be changed to reflect a date other than the one on which the comment was actually sent, or a predated envelope may be used to send a late comment. Expedited mail services are available from the post office and from private carriers to help ensure that comments are delivered timely. We believe that our policy is not only reliable but equitable since it imposes the same constraints on all commenters.

*Comment:* One commenter requested that in all future documents concerning the prospective payment system that are published in the **Federal Register**, we should present a table of outlier criteria and thresholds that includes the labor portion percentage, national ratio of cost to charges, the fixed dollar minimum, and the minimum multiple of the Federal DRG rate.

*Response:* The outlier criteria and thresholds are routinely published in the **Federal Register** as a part of the proposed and final rules concerning the annual update to the prospective payment rates. This information was not published in the May 6, 1986 interim final rule implementing sections 9101 through 9105 and 9112 of Pub. L. 99–272 since the outlier criteria and thresholds for FY 1986 published in the **Federal Register** on September 3, 1985, were not changed as a result of this legislation. We did not see the necessity of republishing this information since we believe it was clearly understood that absent any specific changes made by Pub. L. 99–272, the changes to the prospective payment system that were published in the **Federal Register** on

September 3, 1985 would become effective May 1, 1986.

## III. Rebasing and Reweighting of the Hospital Market Basket

### A. Background

For cost reporting periods beginning on or after July 1, 1979, we developed and adopted a hospital input price index (that is, the hospital "market basket") for use in establishing the limits on hospitals' routine operating costs (44 FR 31802). The percentage change in the market basket reflects the average change in the price of goods and services purchased by hospitals to furnish inpatient care. Traditionally, we used the market basket to adjust hospitals' cost limits by an amount that reflects the average increase in the prices of the goods and services used to furnish inpatient care. This approach linked the increase in the cost limits to the efficient utilization of resources.

With the inception of the prospective payment system on October 1, 1983, we continued to use the market basket to update each hospital's 1981 inpatient operating cost per discharge used in establishing the standardized payment amounts. In addition, the projected change in the market basket is one of the integral components of the update factor by which the prospective payment rates were updated for FY 1985. An explanation of the market basket used to develop the prospective payment rates was published in the **Federal Register** on September 1, 1983 (48 FR 39764). For additional background information on the market basket index, we refer the reader to the article by Freeland, Anderson, and Schendler, "National Hospital Input Price Index," *Health Care Financing Review,* Summer 1979, pp. 37–61.

The market basket is a Laspeyres or fixed-weight price index constructed in two steps. First, a base period is selected and the proportion of total expenditures accounted for by designated spending categories is calculated. These proportions are called cost or expenditure weights. In the second step, a rate of increase for each spending category is multiplied by the expenditure weight for that category. The sum of these products for all cost categories yields the percentage change in the market basket, an estimate of price change for a fixed quantity of purchased goods and services.

The market basket is described as a fixed-weight index because it answers the question of how much more or less it would cost at a later time to purchase the same mix of goods and services that

USCA Case #12-5378    Document #1517760    Filed: 08/13/2014    Page 71 of 77

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Care Financing Administration

### 42 CFR Parts 412 and 413

[BPD–673–F]

RIN 0938–AE56

## Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1991 Rates

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule.

**SUMMARY:** We are revising the Medicare inpatient hospital prospective payment system to implement necessary changes arising from legislation and our continuing experience with the system. In addition, in the Addendum to this final rule, we are describing changes in the amounts and factors necessary to determine prospective payment rates for Medicare inpatient hospital services. In general, these changes are applicable to discharges occurring on or after October 1, 1990. We also set forth rate-of-increase limits for hospitals and hospital units excluded from the prospective payment system.

This final rule also responds to comments received concerning changes to hospital payments made in an April 20, 1990 final rule with comment. These changes include mid-year changes to the inpatient hospital prospective payment system that implemented provisions of the Omnibus Budget Reconciliation Act of 1989; and adjustments applicable to prospective payment hospitals and to the target amounts of hospitals and units excluded from the prospective payment system due to the elimination of the day limitation on covered inpatient hospital days made by the Medicare Catastrophic Coverage Act of 1988 and later repealed by provisions in the Medicare Catastrophic Repeal Act of 1989. The April 20, 1990 final rule with comment also incorporated changes to these provisions made by the Family Support Act of 1988, which clarified the criteria for adjusting the target amounts and implementation date.

In addition, this final rule clarifies the documentation requirements necessary to support the cost allocation of teaching physicians and the allowability of costs for rotating residents in determining payment for the direct costs of an approved graduate medical education program. This clarification is being made as a result of a September 29, 1989 final rule that made changes in

Medicare policy concerning payment for the direct graduate medical education costs of providers associated with approved residency programs in medicine, osteopathy, dentistry, and podiatry.

**EFFECTIVE DATE:** The provisions of this final rule are effective on October 1, 1990, except for the changes concerning § 412.118, the count of full-time equivalent residents for purposes of the indirect medical education adjustment, which apply to cost reporting periods beginning on or after July 1, 1991.

**FOR FURTHER INFORMATION CONTACT:** Barbara Wynn, (301) 966–4529.

**ADDRESSES:** To obtain individual copies of this document, contact the following: Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402, (202) 783–3238. The charge for individual copies is $1.50 for each issue or for each group of pages as actually bound, payable by check or money order to the Superintendent of Documents.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Summary

Under section 1886(d) of the Social Security Act (the Act), a system of payment for acute inpatient hospital stays under Medicare Part A (Hospital Insurance) based on prospectively-set rates was established effective with hospital cost reporting periods beginning on or after October 1, 1983. Under this system, Medicare payment is made at a predetermined, specific rate for each hospital discharge. All discharges are classified according to a list of diagnosis-related groups (DRGs). The regulations governing the inpatient hospital prospective payment system are located in 42 CFR Part 412.

### B. Summary of December 29, 1989 Notice

On September 1, 1989, we published a final rule (54 FR 36452) to implement the seventh year of the prospective payment system. However, on December 19, 1989, the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101–239) was enacted. The portions of sections 6001, 6002, 6003, 6004, 6021, 6110, and 6205 of Public Law 101–239 that affected Medicare payments to hospitals in Federal fiscal year (FY) 1990 and that were self-implementing, were announced in a **Federal Register** notice published on December 29, 1989 (54 FR 53754). These statutory changes provided for the following:

• For discharges occurring on or after January 1, 1990 and before October 1, 1990, the applicable percentage increase

used to update the standardized amounts for prospective payment system hospitals is—

—9.72 percent for hospitals located in rural areas;

—5.62 percent for hospitals located in large urban areas; and

—4.97 percent for hospitals located in other urban areas.

(The increase in the target amount for excluded hospitals and units was not changed and, therefore, continues to be 5.5 percent.)

• Effective for portions of cost reporting periods or discharges occurring during the period beginning January 1, 1990 and ending September 30, 1990, payments for capital-related costs of inpatient services of hospitals under the prospective payment system are reduced by 15 percent.

• For cost reporting periods beginning on or after October 1, 1989, the hospital-specific rate of sole community hospitals is updated by the percentage increase applicable to the geographic area in which the hospital is located. This increase is applicable to discharges occurring on or after January 1, 1990.

• Hospitals that were classified as rural referral centers as of September 30, 1989 continue to be classified as rural referral centers for cost reporting periods beginning on or after October 1, 1989 and before October 1, 1992.

• Hospitals classified as cancer hospitals are excluded from the prospective payment system effective with cost reporting periods beginning on or after October 1, 1989. The reduction for payment of capital costs is eliminated for hospitals classified as cancer hospitals as of December 19, 1989 effective for portions of cost reporting periods or discharges occurring on or after October 1, 1986. For hospitals classified after December 19, 1989, the reduction for payment of capital costs is eliminated for cost reporting periods beginning on or after the date of classification. Special provisions were also made for hospitals that qualify for cancer status before December 31, 1990 (or before December 31, 1991 for hospitals located in States operating a demonstration project under section 1814(b) of the Act as of December 19, 1989). Effective January 18, 1990, a cancer hospital is eligible to receive periodic interim payments if it meets the criteria for receiving these payments. For cost reporting periods beginning on or after April 1, 1989, the base year for determining target amounts for cancer hospitals is to be the hospital's cost reporting period beginning during FY 1987 unless the use of its initial base

A13

USCA Case #12-5378    Document #1497401    Filed: 08/13/2014    Page 72 of 77

system. Therefore, the costs associated with such a unit would not be included in an SCH's or MDH's inpatient operating costs for its FY 1987 cost reporting period, but would be included in those costs for all succeeding cost reporting periods.

So that an SCH or MDH that had an excluded alcohol/drug unit during its FY 1987 cost reporting period will not be disadvantaged, we will allow such a hospital to receive an adjustment to its FY 1987 hospital-specific rate to account for the operating costs associated with that distinct part unit when it was made subject to the prospective payment system as part of the SCH or MDH. Hospitals that believe they should receive this adjustment should contact their fiscal intermediary.

*Comment:* We received many comments regarding how swing bed days should be counted in determining whether a hospital was at least 60 percent Medicare-dependent during its cost reporting period that began during FY 1987. Several commenters noted that although the preamble to the April 20, 1990 final rule with comment period stated that days and discharges from swing beds would be counted if the discharges were for acute care inpatient hospital stays, the regulations text at § 412.108(a)(2) stated that for purpose of determining a hospital's status, "only days and discharges from acute care inpatient stays are counted, including days and discharges from swing beds." Some commenters concluded that the language of the regulation implied that days and discharge from a skilled nursing facility (SNF) level of care could be counted in determining Medicare dependency.

*Response:* The word "hospital" was inadvertently omitted in preparing the regulations text. Under Medicare, there are two types of covered care that can be provided in a swing bed: acute inpatient hospital care and SNF care. Only days and discharges for acute inpatient hospital care are to be counted in determining whether a hospital was at least 60 percent Medicare-dependent during its cost reporting period beginning during FY 1987. SNF days and discharges are not to be included in the count. The MDH provision applies to hospital services only and we do not believe it would be equitable to include other than acute inpatient hospital services in determining whether a hospital qualifies for this provision. We have revised § 412.108(a)(2) to clarify our policy.

*Comment:* Several commenters asked whether days and discharges for Medicare beneficiaries could be included in determining Medicare-

dependency where the care would have been covered by Medicare, except that Medicare was the secondary payor and the primary payor paid for the entire stay. We were asked specifically about how to treat veterans benefits and automobile accident policy payments. In addition, we were asked if part A benefits had been exhausted, could part B-only stays be counted, and whether patient transfers could be counted as discharges.

*Response:* Section 1886(d)(5)(G)(iii)(IV) of the Act states that Medicare-dependency is measured by whether "not less than 60 percent of its inpatient days or discharges during the cost reporting period beginning in fiscal year 1987 were attributable to inpatients entitled to benefits under part A." The scope of benefits to which an individual is entitled to payment under part A set forth in section 1812 of the Act with respect to inpatient hospital services, are limited to 90 days during each benefit period. An additional lifetime reserve of 60 days may be drawn upon when an individual exceeds 90 days in a benefit period. Entitlement to payment under part A ceases after the beneficiary has used 90 days in a benefit period and has either exhausted the lifetime reserve days or elected not to use available lifetime reserve days.

The secondary payment provisions under section 1862(b) of the Act do not affect an individual's entitlement to part A benefits but rather the amount of payment that will be made by Medicare for services furnished to a beneficiary. The Medicare payment amount can range all the way from zero up to the full DRG amount, depending upon the primary payer's payment. However, while Medicare's payment (and the days of utilization counted for benefit period purposes) may be proportionately less than they would be if Medicare were the primary payer, the beneficiary is still entitled to Medicare benefits, and the services furnished to him or her, which are covered under section 1812 of the Act. Therefore, we believe the days and discharges from such a stay should be included in determining a hospital's Medicare dependency for 1987.

We do not believe days and discharges for part B—only stays should be counted. Again, for the MDH provision, section 1886(d)(5)(G)(iii)(IV) of the Act states that Medicare dependency is limited to consideration of those inpatients entitled to part A benefits. Since patients who have exhausted their part A benefits are no longer entitled to payment under part A, we do not believe such stays should be counted. Of course, if the patient was a hospital inpatient at a prospective

payment hospital at the time part A benefits were exhausted, that stay is covered and will count as one discharge. If the benefits are exhausted prior to the stay going into outlier status, all the days of the stay are covered and counted. If the benefits are exhausted during the outlier portion of the stay, only those days prior to exhaustion of the part A benefit are counted.

Under § 412.4, a transfer to another acute care hospital is not considered a discharge for DRG payment purposes. However, for other purposes, a discharge is defined as the formal release of a patient, including death, but excluding newborns and patients who are dead on arrival. For purposes of determining whether a hospital was at least 60 percent Medicare-dependent, we believe a patient transfer should be counted as a discharge regardless of whether the patient was transferred to another acute care hospital, to an area of the hospital not covered under the prospective payment system, or to a less intense level of care. The days for the acute care inpatient hospital portion of the stay should also, of course, be counted in calculating a hospital's Medicare-dependency based on days. The definition of discharges for purposes of the 60-percent Medicare-dependency test is consistent with our definition of discharges for cost reporting purposes and for purposes of determining the hospital-specific rate. We note that the April 20, 1990 final rule with comment period did not explicitly discuss how transfers will be counted in determining the FY 1987 base period cost per discharge. As was the case with the determination of the FY 1982 base period cost per discharge, all transfers will count as discharges in calculating the hospital's FY 1987 Medicare allowable cost per discharge. We are clarifying § 412.75(b) to indicate that a transfer will count as a discharge in calculating the hospital's base period cost per discharge. A similar change has been made in § 412.108(a)(2) for purposes of determining whether the hospital meets the 60-percent Medicare dependency test.

*Comment:* One commenter suggested that a fiscal intermediary can more easily identify HMO and CMP enrollees than can a hospital and the commenter recommended that for purposes of identifying days and discharges for these beneficiaries for MDH purposes, the intermediary should be responsible for automatically including days and discharges in its calculations.

*Response:* We do not agree that identification of HMO and CMP enrollees should be the responsibility of

USCA Case #12-5378    Document #1507400    Filed: 08/13/2014    Page 73 of 77

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Health Care Financing Administration**

**42 CFR Parts 412, 413, 424, 485, and 489**

**[BPD–825–FC]**

**RIN 0938–AG95**

**Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1996 Rates**

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule with comment period.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems for operating costs and capital-related costs to implement necessary changes arising from our continuing experience with the system. In addition, in the addendum to this final rule, we are describing changes in the amounts and factors necessary to determine prospective payment rates for Medicare hospital inpatient services for operating costs and capital-related costs. These changes are applicable to discharges occurring on or after October 1, 1995. We are also setting forth rate-of-increase limits as well as policy changes for hospitals and hospital units excluded from the prospective payment systems. Finally, we are setting forth several requirements concerning Essential Access Community Hospitals (EACHs) and Rural Primary Care Hospitals (RPCHs), in accordance with provisions of the Social Security Act Amendments of 1994.

**DATES:** *Effective Date:* This final rule is effective on October 1, 1995, except that revised § 412.46 (concerning the physician attestation requirement for inpatient claims) is effective September 1, 1995.

*Comments:* Comments on revised § 485.645 (concerning the requirements for RPCH providers of long-term care services ("swing beds")) will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on October 31, 1995. We will not consider comments concerning any other issue.

**ADDRESSES:** Mail written comments (1 original and 3 copies) to the following address: Health Care Financing Administration, Department of Health and Human Services, Attention: BPD–825–FC, P.O. Box 7517, Baltimore, MD 21207–0517.

If you prefer, you may deliver your written comments (1 original and 3

copies) to one of the following addresses: Room 309–G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC 20201, or Room C5–09–26, 7500 Security Boulevard, Baltimore, MD 21244–1850.

Because of staffing and resource limitations, we cannot accept comments by facsimile (FAX) transmission. In commenting, please refer to file code BPD–825–FC. Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in Room 309–G of the Department's offices at 200 Independence Avenue SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (phone: (202) 690–7890).

*Copies:* To order copies of the **Federal Register** containing this document, send your request to: New Orders, Superintendent of Documents, P.O. Box 371954, Pittsburgh, PA 15250–7954. Specify the date of the issue requested and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or Master Card number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 512–1800 or by faxing to (202) 512–2250. The cost for each copy is $8.00. As an alternative, you can view and photocopy the **Federal Register** document at most libraries designated as Federal Depository Libraries and at many other public and academic libraries throughout the country that receive the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:**
Nancy Edwards, (410) 786–4531, Operating Prospective Payment, DRG, Wage Index Issues.
Tzvi Hefter, (410) 786–4529, Capital Prospective Payment, Excluded Hospitals, EACH, RPCH.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. Summary

Under section 1886(d) of the Social Security Act (the Act), a system of payment for the operating costs of acute care hospital inpatient stays under Medicare Part A (Hospital Insurance) based on prospectively-set rates was established effective with hospital cost reporting periods beginning on or after October 1, 1983. Under this system, Medicare payment for hospital inpatient operating costs is made at a predetermined, specific rate for each hospital discharge. All discharges are classified according to a list of diagnosis-related groups (DRGs). The regulations governing the hospital

inpatient prospective payment system are located in 42 CFR part 412. On September 1, 1994, we published a final rule with comment period (59 FR 45330) to implement changes to the prospective payment system for hospital operating costs beginning with Federal fiscal year (FY) 1995.

For cost reporting periods beginning before October 1, 1991, hospital inpatient operating costs were the only costs covered under the prospective payment system. Payment for capital-related costs had been made on a reasonable cost basis because, under sections 1886 (a)(4) and (d)(1)(A) of the Act, those costs had been specifically excluded from the definition of inpatient operating costs. However, section 4006(b) of the Omnibus Budget Reconciliation Act of 1987 (Public Law 100–203) revised section 1886(g)(1) of the Act to require that, for payments paid under the prospective payment system for operating costs, capital-related costs would also be paid under a prospective payment system effective with cost reporting periods beginning on or after October 1, 1991. As required by section 1886(g) of the Act, we replaced the reasonable cost-based payment methodology with a prospective payment methodology for hospital inpatient capital-related costs. Under the new methodology, effective for cost reporting periods beginning on or after October 1, 1991, a predetermined payment amount per discharge is made for Medicare inpatient capital-related costs. (See subpart M of 42 CFR part 412, and the August 30, 1991, final rule (56 FR 43358) for a complete discussion of the prospective payment system for hospital inpatient capital-related costs.)

### B. Major Contents of the Provisions of the June 2, 1995 Proposed Rule

On June 2, 1995, we published a proposed rule in the **Federal Register** (60 FR 29202) setting forth proposed changes to the Medicare hospital inpatient prospective payment systems for both operating costs and capital-related costs, as well as changes affecting hospitals excluded from those payment systems. The following is a summary of the major changes that we proposed to make:

• We proposed changes for FY 1996 DRG classifications and relative weighting factors as required by section 1886(d)(4)(C) of the Act.

• We proposed to update the wage index for FY 1996. Specific issues included allocation of general service salaries and hours to excluded areas, and revisions to the wage index based on hospital redesignations.

intermediaries that have been applying our policy appropriately will continue that practice.

*Comment:* Several commenters questioned whether the costs of these neonatal intermediate units were included in the calculation of the prospective payment system standardized amounts. They stated that unless we could demonstrate that the costs of these units were included in the base year used to calculate the standardized amounts, there is no basis for counting these beds when determining the resident-to-bed ratio.

*Response:* As indicated above in a previous response to comment, our policy to include the days, costs, and beds of these units predates the prospective payment system, as well as the base year (1981) that was used to set the standardized payment amounts. Consequently, we disagree that we should be prohibited from clarifying this policy due to apparent inconsistencies in its implementation.

*Comment:* Additional comments related specifically to how we differentiate between healthy baby nursery beds and special care beds. Commenters requested guidance on the status of those beds that are occasionally used to treat less healthy newborns, but that are actually located within a regular, healthy baby nursery. The commenters noted that currently there is no clear definition in the regulations or manual instructions that could be used to identify an intermediate level of special care between a healthy, or regular, nursery and a neonatal intensive care unit. Finally, one commenter suggested that we consider licensure criteria for distinguishing between treatment units.

*Response:* Our bed counting policy essentially is determined by our policies for including or excluding costs and days from the calculation of Medicare costs on the cost report. These policies have consistently followed the general principle that we do not attribute costs or days to individual beds, but rather to units or departments. Therefore, individual beds that are occasionally used to treat less healthy infants, but that are located within a regular, healthy baby nursery, continue to be treated as part of the unit in which they are located, that is, as part of the healthy baby nursery. In considering whether the beds used to treat sick infants constitute an intermediate neonatal care unit, one must consider the cost center concept. Section 2302.8 of the Provider Reimbursement Manual-Part 2 describes a cost center ''as an organizational unit, generally a department or its subunit, having a common functional purpose

for which direct and indirect costs are accumulated * * *.'' A regular, healthy baby nursery serves as a custodian of healthy infants, whereas the intermediate or subintensive neonatal care unit provides medical care to sick infants with very different types of costs being incurred. Therefore, the appropriate cost center with which to count the beds of an intermediate neonatal care unit is the Adults and Pediatrics cost center.

While there is a great deal of variation in the types of units that exist to care for infants, the Medicare fiscal intermediaries have been required for some time to distinguish between nurseries and intermediate units for cost reporting purposes.

Also, concerning the suggestion that we rely on licensure designations to differentiate between units, we do not believe this would be a feasible alternative due to variations in licensing criteria across the country.

*Comment:* A representative of a group of Medicare's fiscal intermediaries requested that we retain the language in §412.105(b) specifically including neonatal intensive care beds in the bed count. This commenter also pointed out that what we refer to as beds are often referred to instead as bassinets, and that we should include both phrases in the regulations. Finally, we were asked to clarify our policy regarding the counting of beds or bassinets kept in the mother's room, for example, in an alternative birthing center.

*Response:* We proposed deleting the reference to the inclusion of neonatal intensive care unit beds from the regulations because we believe that reference led to confusion concerning the beds excluded from the hospital bed count. We continue to believe that the proposed wording, combined with the policy clarification published in last year's proposed and final rules, sufficiently defines our intentions as to which beds are to be excluded. We agree that ''bassinets'' should be included in the definition for determination of the number of beds. Therefore, we are revising §412.105(b) accordingly.

With regard to beds placed in the mother's room rather than in a healthy baby nursery, these beds or bassinets are not counted in addition to the mother's bed already present in that room. We do not believe, however, that it is necessary at this time to add a reference to this issue in §412.105. Nevertheless, we will continue to evaluate the policy implications of these arrangements in the future.

*E. Disproportionate Share Adjustment (Section 412.106)*

Section 1886(d)(5)(F) of the Act provides for additional payments for hospitals that serve a disproportionate share of low income patients. A hospital's disproportionate share adjustment is determined by calculating two patient percentages (Medicare Part A/Supplemental Security Income (SSI) covered days to total Medicare covered days, and Medicaid but not Medicare Part A covered days to total inpatient hospital days), adding them together, and comparing that total percentage to the hospital's qualifying criteria. These calculations are done by HCFA and the fiscal intermediary on a Federal fiscal year basis. However, §412.106(b)(3) currently states that if a hospital prefers that HCFA use its cost reporting period instead of the Federal fiscal year, it must furnish to its intermediary, in machine-readable format as prescribed by HCFA, data on its Medicare Part A patients for its cost reporting period. These data take the place of the Federal fiscal year MedPAR file data in obtaining the Medicare Part A/SSI percentage. To ensure that the hospital is reporting actual Medicare Part A patient days, we match the hospital's data to the HCFA MedPAR data. In addition, we have required that a hospital accept the recalculated percentage, even if it is lower than the Federal fiscal year percentage.

In the last few years, this process has proven to be unsatisfactory for several reasons. First, it is an administrative burden for the hospital to prepare a tape that includes all its Medicare Part A inpatient days. In addition, the hospital's tape data have seldom exactly matched the MedPAR data. In that case, we can use only the data that match. Finally, and probably often due to this second problem, the resulting disproportionate patient percentages are invariably lower than the original HCFA determined percentage. We proposed to alleviate these problems by continuing to provide hospitals an alternative to base their percentage on their cost reporting year, but relieving them of the tape requirement.

Therefore, we proposed that if a hospital wishes a recalculation based on its cost reporting period, the hospital would notify HCFA in writing of its request that the Medicare Part A/SSI percentage be calculated based on its own cost reporting year. The hospital would be required to provide HCFA with its name, provider number, and cost report period end date. HCFA, in turn, would use all MedPAR records for that hospital from the requested time

A16

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Centers for Medicare & Medicaid Services

42 CFR Parts 403, 412, 413, 418, 460, 480, 482, 483, 485, and 489

[CMS–1428–F]

RIN 0938–AM80

## Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates

**AGENCY:** Centers for Medicare and Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** We are revising the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs to implement changes arising from our continuing experience with these systems; and to implement a number of changes made by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 that was enacted on December 8, 2003. In addition, in the Addendum to this final rule, we describe the changes to the amounts and factors used to determine the rates for Medicare hospital inpatient services for operating costs and capital-related costs. These changes are applicable to discharges occurring on or after October 1, 2004. We also are setting forth rate-of-increase limits as well as policy changes for hospitals and hospital units excluded from the IPPS that are paid in full or in part on a reasonable cost basis subject to these limits.

Among the policy changes that we are making are: Changes to the classification of cases to the diagnosis-related groups (DRGs); changes to the long-term care (LTC)–DRGs and relative weights; changes in the wage data, labor-related share of the wage index, and the geographic area designations used to compute the wage index; changes in the qualifying threshold criteria for and the approval of new technologies and medical services for add-on payments; changes to the policies governing postacute care transfers; changes to payments to hospitals for the direct and indirect costs of graduate medical education; changes to the payment adjustment for disproportionate share rural hospitals; changes in requirements and payments to critical access hospitals (CAHs); changes to the disclosure of information requirements for Quality Improvement Organization (QIOs); and changes in the hospital conditions of participation for discharge planning and fire safety requirements for certain health care facilities.

**DATES:** The provisions of this final rule are effective on October 1, 2004.

**FOR FURTHER INFORMATION CONTACT:**

Jim Hart, (410) 786–9520, Operating Prospective Payment, Diagnosis-Related Groups (DRGs), Wage Index, New Medical Services and Technology, Standardized Amounts, Hospital Geographic Reclassifications, Postacute Care Transfers, and Disproportionate Share Hospital Issuesp; Tzvi Hefter, (410) 786–4487, Capital Prospective Payment, Excluded Hospitals, Graduate Medical Education, Critical Access Hospitals, and Long-Term Care (LTC)–DRGs Issues;

Mary Collins, (410) 786–3189, CAH Bed Limits and Distinct Part Unit Issues; John Eppinger, (410) 786–4518, CAH Periodic Interim Payment Issues; Maria Hammel, (410) 786–1775, Quality Improvement Organization Issues; Siddhartha Mazumdar, (410) 786–6673, Rural Community Hospital Demonstration Project Issues; Jeannie Miller, (410) 786–3164, Bloodborne Pathogens Standards, Hospital Conditions of Participation for Discharge Planning, and Fire Safety Requirements Issues; Dr. Mark Krushat, (410) 786–6809; and Dr. Anita Bhatia, (410) 786–7236, Quality Data for Annual Payment Update Issues.

**SUPPLEMENTARY INFORMATION:**

### Availability of Copies and Electronic Access

*Copies:* To order copies of the **Federal Register** containing this document, send your request to: New Orders, Superintendent of Documents, P.O. Box 371954, Pittsburgh, PA 15250–7954. Specify the date of the issue requested and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or Master Card number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 512–1800 or by faxing to (202) 512–2250. The cost for each copy is $10.00. As an alternative, you can view and photocopy the **Federal Register** document at most libraries designated as Federal Depository Libraries and at many other public and academic libraries throughout the country that receive the **Federal Register**.

This **Federal Register** document is also available from the **Federal Register** online database through GPO Access, a service of the U.S. Government Printing Office. Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web; the Superintendent of Documents home page address is *http://www.access.gpo.gov/nara_docs/,* by using local WAIS client software, or by telnet to *swais.access.gpo.gov,* then login as guest (no password required). Dial-in users should use communications software and modem to call (202) 512–1661; type swais, then login as guest (no password required).

### Acronyms

ACGME—Accreditation Council on Graduate Medical Education
AHIMA—American Health Information Management Association
AHA—American Hospital Association
AOA—American Osteopathic Association
ASC—Ambulatory Surgical Center
BBA—Balanced Budget Act of 1997, Pub. L. 105–33
BIPA—Medicare, Medicaid, and SCHIP [State Children's Health Insurance Program] Benefits Improvement and Protection Act of 2000, Pub. L. 106–554
BLS—Bureau of Labor Statistics
CAH—Critical access hospital
CART CMS—Abstraction & Reporting Tool
CBSAs—Core-Based Statistical Areas
CC—Complication or comorbidity
CMS—Centers for Medicare & Medicaid Services
CMSA—Consolidated Metropolitan Statistical Area
COBRA—Consolidated Omnibus Reconciliation Act of 1985, Pub. L. 99–272
CoP—Condition of Participation
CPI—Consumer Price Index
CRNA—Certified registered nurse anesthetist
DRG—Diagnosis-related group
DSH—Disproportionate share hospital
ESRD—End-stage renal disease
FDA—Food and Drug Administration
FQHC—Federally qualified health center
FSES—Fire Safety Evaluation System
FTE—Full-time equivalent
FY—Federal fiscal year
GME—Graduate medical education
HCRIS—Hospital Cost Report Information System
HIPC—Health Information Policy Council
HIPAA—Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191
HHA—Home health agency
HPSA—Health Professions Shortage Area
ICD–9–CM—International Classification of Diseases, Ninth Revision, Clinical Modification
ICD–10–PCS—International Classification of Diseases, Tenth Edition, Procedure Coding System
ICF/MRs—Intermediate care facilities for the mentally retarded
IME—Indirect medical education
IPPS—Acute care hospital inpatient prospective payment system
IPF—Inpatient psychiatric facility
IRF—Inpatient rehabilitation facility
JCAHO—Joint Commission on the Accreditation of Healthcare Organizations
LAMA—Left Against Medical Advice
LTC–DRG—Long-term care diagnosis-related group

A17

periods beginning on or after October 1, 2004.

3. Dual-Eligible Patient Days

As described above, the DSH patient percentage is equal to the sum of the percentage of Medicare inpatient days attributable to patients entitled to both Medicare Part A and SSI benefits, and the percentage of total inpatient days attributable to patients eligible for Medicaid but not entitled to Medicare Part A benefits. If a patient is a Medicare beneficiary who is also eligible for Medicaid, the patient is considered dual-eligible and the patient days are included in the Medicare fraction of the DSH patient percentage but not the Medicaid fraction. This is consistent with the language of section 1886(d)(5)(F)(vi)(II) of the Act, which specifies that patients entitled to benefits under Part A are excluded from the Medicaid fraction.

It has come to our attention that we inadvertently misstated our current policy with regard to the treatment of certain inpatient days for dual-eligibles in the proposed rule of May 19, 2003 (68 FR 27207). In that proposed rule, we indicated that a dual-eligible beneficiary is included in the Medicare fraction even after the patient's Medicare Part A hospital coverage is exhausted. That is, we stated that if a dual-eligible patient is admitted without any Medicare Part A hospital coverage remaining, or the patient exhausts Medicare Part A hospital coverage while an inpatient, the non-covered patient days are counted in the Medicare fraction. This statement was not accurate. Our policy has been that only covered patient days are included in the Medicare fraction (§ 412.106(b)(2)(i)). A notice to this effect was posted on CMS's Web site (*http://www.cms.hhs.gov/providers/hipps/dual.asp*) on July 9, 2004.

*Comment:* We received numerous comments that commenters were disturbed and confused by our recent Web site posting regarding our policy on dual-eligible patient days. The commenters believed that this posting was a modification or change in our current policy to include patient days of dual-eligible Medicare beneficiaries whose Medicare Part A coverage has expired in the Medicaid fraction of the DSH calculation. In addition, the commenters believed that the information in this notice appeared with no formal notification by CMS and without the opportunity for providers to comment.

*Response:* The notice that was posted on our Web site was not a change in our current policy. Our current policy is, if a patient is a Medicare beneficiary who

is also eligible for Medicaid, the patient is considered dual-eligible and the patient days are included in the Medicare fraction of the DSH patient percentage but not the Medicaid fraction. This is consistent with the language of section 1886(d)(5)(F)(vi)(II) of the Act, which specifies that patients entitled to benefits under Medicare Part A are excluded from the Medicaid fraction.

The Web site posting is a correction of an inadvertent misstatement made in the May 19, 2003 proposed rule (68 FR 27207). This Web site posting was not a new proposal or policy change. As a result, we do not believe it is necessary to utilize the rule making process in correcting a misstatement that was made in the May 19, 2003 proposed rule regarding this policy.

In the proposed rule of May 19, 2003 (68 FR 27207), we proposed to change our policy to begin to count in the Medicaid fraction of the DSH patient percentage the patient days of dual-eligible Medicare beneficiaries whose Medicare coverage has expired. We note that the statutory provision referenced above stipulates that the Medicaid fraction is to include patients who are eligible for Medicaid. However, the statute also requires that patient days attributable to patients entitled to benefits under Medicare Part A are to be excluded from the Medicaid fraction.

*Comment:* Numerous commenters opposed our proposal to begin to count in the numerator of the Medicaid fraction of the DSH patient percentage, the patient days of dual-eligible Medicare beneficiaries whose Medicare inpatient coverage has expired. They objected that the proposal would result in a reduction of DSH payments when the exhausted coverage days are removed from the Medicare fraction and included in the Medicaid fraction. According to these commenters, any transfer of a particular patient day from the Medicare fraction (based on total Medicare patient days) to the Medicaid fraction (based on total patient days) would dilute the value of that day and, therefore, reduce the overall patient percentage and the resulting DSH payment adjustment.

One commenter observed that a patient who exhausts coverage for inpatient hospital services still remains entitled to other Medicare Part A benefits. This commenter found it difficult to reconcile the position that these patients are not entitled to Medicare Part A benefits when they can receive other covered Part A services, such as SNF services.

In addition, some commenters stated that these days should not be included

in either the Medicare or Medicaid fraction. They indicated that the days should not be included in the Medicare fraction because that computation includes the number of patient days actually furnished to patients who were entitled to both Medicare Part A and SSI benefits. The commenters stated that the days should also be excluded from the Medicaid fraction because that computation excludes hospital patient days for patients who, for those days, were entitled to benefits under Medicare Part A.

Commenters also indicated that the proposal would put an increased administrative burden on the hospitals to support including these patient days in the Medicaid fraction. They recommended that if we finalize this policy, the requirement that hospitals submit documentation justifying the inclusion of the days in the Medicaid fraction should be removed.

*Response:* We proposed this change to facilitate consistent handling of these days across all hospitals, in recognition of the reality that, in some States, fiscal intermediaries are reliant upon hospitals to identify days attributable to dual-eligible patients whose Medicare Part A hospitalization benefits have expired. We believe it is important that all IPPS policies be applied consistently for all hospitals around the country.

However, we acknowledge the point raised by the commenter that beneficiaries who have exhausted their Medicare Part A inpatient coverage may still be entitled to other Medicare Part A benefits. We also agree with the commenter that including the days in the Medicare fraction has a greater impact on a hospital's DSH patient percentage than including the days in the Medicaid fraction. This is necessarily so because the denominator of the Medicare fraction (total Medicare inpatient days) is smaller than the denominator of the Medicaid fraction (total inpatient days). However, we note that we disagree with the commenter's assertion that including days in the Medicaid fraction instead of the Medicare fraction always results in a reduction in DSH payments. For instance, if a dual-eligible beneficiary has not exhausted Medicare Part A inpatient benefits, and is not entitled to SSI benefits, the patient days for that beneficiary are included in the Medicare fraction, but only in the denominator of the Medicare fraction (because the patient is not entitled to SSI benefits). The inclusion of such patient days in the Medicare fraction has the result of decreasing the Medicare fraction in the DSH patient percentage.

A18

For these reasons, we have decided not to finalize our proposal stated in the May 19, 2003 proposed rule to include dual-eligible beneficiaries who have exhausted their Part A hospital coverage in the Medicaid fraction. Instead, we are adopting a policy to include the days associated with dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary has exhausted Medicare Part A hospital coverage. If the patient is entitled to Medicare Part A and SSI, the patient days will be included in both the numerator and denominator of the Medicare fraction. This policy will be effective for discharges occurring on or after October 1, 2004. We are revising our regulations at § 412.106(b)(2)(i) to include the days associated with dual-eligible beneficiaries in the Medicare fraction of the DSH calculation.

4. Medicare+Choice (M+C) Days

Under existing § 422.1, an M+C plan means "health benefits coverage offered under a policy or contract by an M+C organization that includes a specific set of health benefits offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the M+C plan." Generally, each M+C plan must provide coverage of all services that are covered by Medicare Part A and Part B (or just Part B if the M+C plan enrollee is only entitled to Part B).

We have received questions whether the patient days associated with patients enrolled in an M+C Plan should be counted in the Medicare fraction or the Medicaid fraction of the DSH patient percentage calculation. The question stems from whether M+C plan enrollees are entitled to benefits under Medicare Part A since M+C plans are administered through Medicare Part C.

We note that, under existing regulations at § 422.50, an individual is eligible to elect an M+C plan if he or she is entitled to Medicare Part A and enrolled in Part B. However, once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A. In the proposed rule of May 19, 2003 (68 FR 27208), we proposed that once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary would not be included in the Medicare fraction of the DSH patient percentage. Under our proposal, these patient days would be included in the Medicaid fraction. The patient days of dual-eligible M+C beneficiaries (that is, those also eligible for Medicaid) would be included in the count of total patient days in both the numerator and denominator of the Medicaid fraction.

*Comment:* Several commenters indicated that they appreciated CMS's attention to this issue in the proposed rule. The commenters also indicated that there has been insufficient guidance on how to handle these days in the DSH calculation. However, several commenters disagreed with excluding these days from the Medicare fraction and pointed out that these patients are just as much Medicare beneficiaries as those beneficiaries in the traditional fee-for-service program.

*Response:* Although there are differences between the status of these beneficiaries and those in the traditional fee-for-service program, we do agree that once Medicare beneficiaries elect Medicare Part C coverage, they are still, in some sense, entitled to benefits under Medicare Part A. We agree with the commenter that these days should be included in the Medicare fraction of the DSH calculation. Therefore, we are not adopting as final our proposal in the May 19, 2003 proposed rule to include the days associated with M+C beneficiaries in the Medicaid fraction. Instead, we are adopting a policy to include the patient days for M+C beneficiaries in the Medicare fraction. As noted previously, if the beneficiary is also an SSI recipient, the patient days will be included in the numerator of the Medicare fraction. We are revising our regulations at § 412.106(b)(2)(i) to include the days associated with M+C beneficiaries in the Medicare fraction of the DSH calculation.

*M. Payment Adjustments for Low-Volume Hospitals (§ 412.101)*

Section 406 of Public Law 108–173 amended section 1886(d) of the Act to add a new subclause (12) to provide for a new payment adjustment to account for the higher costs per discharge of low-volume hospitals under the IPPS. Section 1886(d)(12)(C)(i) of the Act, as added by section 406, defines a low-volume hospital as a "subsection (d) hospital * * * that the Secretary determines is located more than 25 road miles from another subsection (d) hospital and that has less than 800 discharges during the fiscal year." Section 1886(d)(12)(C)(ii) of the Act further stipulates that the term "discharge" refers to total discharges, and not merely to Medicare discharges. Specifically, the term refers to the "inpatient acute care discharge of an individual regardless of whether the individual is entitled to benefits under part A." Finally, the provision requires the Secretary to determine an applicable percentage increase for these low-volume hospitals based on the "empirical relationship" between "the

standardized cost-per-case for such hospitals and the total number of discharges of these hospitals and the amount of the additional incremental costs (if any) that are associated with such number of discharges." The statute thus mandates the Secretary to develop an empirically justifiable adjustment formula based on the relationship between costs and discharges for these low-volume hospitals. The statute also limits the adjustment to no more than 25 percent.

MedPAC has published an analysis of the financial performance and cost profiles of low-volume hospitals (MedPAC June 2001 Report to Congress, page 66). Its analysis indicated that hospitals with 500 discharges or less generally have negative Medicare margins. Specifically, hospitals with 200 discharges or less have margins of −16.4 percent, and hospitals with 201 to 500 discharges have margins of −2.1 percent. MedPAC's analysis further revealed that hospitals with a small volume of discharges have higher costs per discharge than larger facilities, after controlling for the other cost factors recognized in the payment system. MedPAC's analysis thus indicates that low-volume providers are disadvantaged by payment rates based on average volume. In analyzing the relationship between cost per case and discharges, MedPAC also found that this relationship begins to level off and reaches zero variation at around 500 discharges. Therefore, MedPAC recommended an adjustment formula in the form of:

$$1.25 - (.0005*D), \text{ if } D<500 \text{ discharges}$$

Where 1.25 represents the maximum 25-percent add-on, .0005 is the payment adjustment per case (derived by dividing .25 by 500 discharges) and "D" is the number of discharges.

Using FY 2001 cost report data, we found an even greater disparity than MedPAC found between low-volume providers and their higher-volume counterparts. Although Medicare margins remain healthy overall at 9.32 percent, the Medicare margin for providers with 200 or less discharges is −46.26 percent, and the margin for providers with 201 to 500 discharges is −11.74 percent. For the May 18, 2004 proposed rule, we employed a bivariate regression analysis to determine the fit between total hospital discharges and operating costs from FY 2001.

As discussed in the proposed rule, we found a very strong correlation between costs and the total number of discharges. We then examined the variation in cost-per-case among subsection (d) hospitals, using both log